FIRST NATIONAL BANK *v.* WADDELL.

Opinion delivered February 18, 1905.

1.  GUARANTY—WHEN CONTINUING.—A guarantor obligated himself that the principals would pay any and all indebtedness to the obligee, to the extent of $3,000, on or before April 1, 1891; and the evidence showed that the principals, who had no capital to do business on, contemplated business operations which necessarily required the use of thousands of dollars monthly or daily, and that such obligation was executed to give them a basis of credit.  *Held,* that the guaranty was a continuing one for advances made up to April 1, 1891, which was not discharged by payments made by the principals so long as any part of the debt guarantied remained unpaid.  (Page 245.)

2.  PLEDGE—DEPRECIATION.—While a pledgee, holding personal property of a fluctuating character as collateral security for a debt, is bound to use reasonable diligence in preserving such property, mere delay in enforcing such security, resulting in its depreciation in value,

will not discharge a surety or guarantor, where the market continued dull, and no request was made of the pledgee to realize on the security. (Page 248.)

3. USURY—INTEREST ON MONTHLY BALANCES.—A contract between a bank and a customer, contemplating monthly debits and credits in large sums, which provided that the bank should charge the highest lawful rate of interest, and that the rate should be computed monthly on the average daily debit balances, and charged in the account, was not usurious. (Page 250.)

4. HE WHO ASKS EQUITY MUST DO EQUITY.—A mortgagor cannot ask the cancellation of a purchase by the mortgagee at foreclosure sale on the ground that the latter was debarred from purchasing by reason of his trust relationship, without paying or offering to pay the obligation secured by the mortgage. (Page 252.)

5. APPEAL—QUESTION NOT RAISED BELOW.—A question as to the mortgagee's right to purchase at foreclosure sale, not raised in the pleadings and proof below, cannot be raised on appeal. (Page 252.)

Appeal from Phillips Chancery Court.

EDWARD D. ROBERTSON, Chancellor.

Reversed.

### STATEMENT BY THE COURT.

Appellee, B. B. Waddell, on April 25, 1898, filed a complaint at law against appellants, the First National Bank of Helena, Ark., Lycurgus Lucy and Jacob Trieber, to cancel his mortgage executed to Lucy on October 11, 1890, conveying the real estate in controversy situated in the city of Helena, and the foreclosure sale thereunder, and the deeds executed subsequently, through which appellant First National Bank claims title. On motion of defendants, the cause was transferred to equity. The conditions of the mortgage are as follows: "Whereas the said Lycurgus Lucy has agreed to become surety at our request for any and all indebtedness for which W. B. Lewis & Company, a firm composed of W. B. Lewis and Paul Waddell, may become indebted and liable for to the First National Bank of Helena, Ark., during the cotton season of 1890 and 1891, either by note, overdraft, or otherwise, to the extent of $3,000. Now, therefore, if said W. B. Lewis & Company, or either of them, or either of us, shall, on or before the 1st day of April,

1891, well and truly pay off all and every part of such indebtedness, whether evidenced by note or open account on the books of said bank, all their advances to bear interest at the rate of 10 per cent. per annum, then this deed to be void and of no effect; but if they shall fail to pay the same, or any part thereof, then this deed shall remain in full force, and the said Lycurgus is hereby authorized to sell said property," etc.

·Paul Waddell, son of appellee, was a member of the firm of W. B. Lewis & Company, and, being without means, the inducement to appellee to execute the mortgage was to assist his son in embarking in the cotton business (buying and selling cotton) during the season of 1890 and 1891.

· Appellee alleges in his complaint, and it is shown .by the proof, that on the date of the execution of the mortgage W. B. Lewis & Company were indebted to appellant bank, of which Lucy was then cashier, in the sum of $3,700, and Lucy was surety to the bank for Lewis & Company to the extent of $3,000.

On April 1, 1891, Lewis & Company were indebted to the bank in the sum of $23,767.06, for which the bank held a large quantity of cotton pledged as security. This cotton was held by the bank until May, 1892, and then sold, and proceeds applied on the debt, reducing same to the sum of about $11,000. On January 31, 1893, the real estate was sold by Lucy under the mortgage for the price of $3,100 to Jacob Trieber, the vice president and one of the attorneys of the bank, who later conveyed to the bank. After crediting the price of the land on the account of Lewis & Company, the books of the bank showed a debit of $7,914 balance against them. The court below rendered a decree cancelling the mortgage and subsequent deeds thereunder, as prayed for, and the defendants appealed.

*M. L. Stephenson, R. W. Nicholls* and *Morris M. Cohn,* for appellants.

The contract was not usurious. 18 Ark. 9; 6 Ark. 463; 46 Ark. 50; Tyler, Usury, 241; 37 Ga. 384; 67 N. W. 456; 30 S. E. 713; 34 N. Y. Sup. 606; 32 S. E. 531; 20 So. 428; 68 Ark. 162; 19 Ark. 481; 23 Ark. 739; 34 Ark. 267; 36 Ark. 451; 37 N. E. 840; 32 Ark. 346; 60 Ark. 288. An agreement

to pay interest on interest after it becomes due is enforceable. 54 Ala. 646; 114 Cal. 64; 105 Ill. 540; 91 Me. 340; 11 Mo. App. 55; 28 Ohio, 265; 11 W. Va. 549; 38 Ark. 114; 37 Me. 308; 26 C. C. A. 70; 80 Fed. 655; 11 Conn. 487; 4 Ark. 216; 9 Ia. 317. Appellees are not entitled to plead usury. Sand. & H. Dig. § § 5086-5087; 66 Ark. 121; 68 Ark. 162, 299; 67 Ark. 252; 56 Ark. 45; 64 Ark. 271; 18 Ark. 369; 55 Ark. 318; 67 N. Y. 162. The State law has no application to the transaction. 91 U. S. 29; 98 U. S. 555; 100 U. S. 239; 153 U. S. 318; 31 Ark. 346; 155 Mo. 58; 112 Ga. 232; 106 Ala. 364; 115 Mass. 539; 133 Mass. 248; 109 Ala. 157; 57 Barb. 429; 26 Oh. St. 75; 74 N. C. 514; 91 U. S. 35; 153 U. S. 318; 111 U. S. 197. Under Federal law usury cannot be set up here. 83 Fed. 269; 72 Hun. 373; 60 Cal. 387; 184 U. S. 151; 165 Pa. St. 199; 36 Pac. 905; 40 S. W. 413; 96 Pa. St. 340; 47 Ark. 54; 55 Ark. 319; 175 Pa. St. 494; 44 Ind. 290; 169 U. S. 416. A surety cannot set up usury under the act of Congress. 44 Ind. 298; 79 Pa. St. 453; 76 N.W. 800; 59 Fed. 917; Brandt, Sur. & Guar. § 202; Ping. Sur. & Guar. § 185; 11 W. Va. 523; 35 N. J. L. 285. Appellee could not raise the question as to the right to take real estate as security. 98 U. S. 621; 103 U. S. 99; 112 U. S. 405, 439; 133 U. S. 318; 52 Ia. 541; 4 Ill. App. 305; 71 Mo. 221; 153 Mo. 7; 130 N. Y. 221; 158 Ill. 532; 33 Minn. 40; 29 Fed. 734; 20 Or. 421; 61 Neb. 575; 36 Ia. 443; 100 U. S. 239; 146 U. S. 240; 69 S. W. 702; 95 Tenn. 480. There was no extension of the debt, so as to release the appellee. 48 Ark. 261; 23 Ark. 163. A party is bound by the admissions in his own pleadings. 19 Ark. 319; 32 Ark. 470; 67 Ark. 278. The agreement entered into cannot be varied by any parol agreement. 30 Ark. 186; 38 Ark. 334; 51 Ark. 441; 65 Ark. 333; 26 Pac. 276.

*St. John Waddell, Quarles & Moore* and *Rose, Hemingway & Rose,* for appellee.

No consideration passed for the mortgage. Brandt, Sur. & Guar. § § 122, 156; 61 Ark. 420. The mortgage was fully paid. 15 Conn. 457; 45 Am. Dec. 484; 16 Barb. 82; 5 Phil. 70; 7 R. I. 576; 4 Ark. 76; 6 Ark. 142; Brandt, Sur. & Guar.

§ § 440, 445; 34 Ark. 80; 37 Tenn. 79. The contract was usurious. 62 Ark. 370; 11 Am. & Eng. Enc. Law, 403, 408; 1 John. Chy. 15; 51 Miss. 304; 62 Ark. 92: 53 Ark. 271; 56 Neb. 565; 32 Ark. 366; 47 Neb. 579; Sand. & H. Dig. § 5088. The mortgage sale was invalid. 11 Ark. 57; Jones, Mortg. § 826; 53 Ark. 185; 83 Am. Dec. 219; 1 Paige, 78; 51 Am. Dec. 95. The bank's purchase under the sale was void. 23 Ark. 622; 30 Ark. 44; 33 Ark. 587.

*M. L. Stephenson, R. W. Nicholls* and *Morris M. Cohn,* for appellants in reply.

The construction of the mortgage should be resolved against the guarantor. 1 How. 182; 2 How. 426; 53 Ark. 107; 3 Ark. 18; 15 Ark. 703; 27 Ark. 523. The guaranty was continuous. 7 Pet. 113; 61 Mich. 327; 142 N. Y. 207; 73 N. Y. 335; 18 N. Y. 502; 24 N. Y. 64; 12 Gray, 447; 139 Ind. 524; 46 Mich. 70; 145 Ill. 488; 67 Conn. 147; 57 Conn. 224; 44 How. Pr. 91; 14 Neb. 158; 79 Tex. 516; 86 Tex. 690; 62 Barb. 351; 2 Camp. 413, 436; 7 Pet. 113; 73 N. Y. 335; 18 N. Y. 502; 15 Ind. App. 382; 14 Neb. 158; 86 Tex. 690; 1 Jones, Mortg. § 379; 32 Ark. 598, 645; 45 Am. Dec. 484; 46 Ark. 131; 32 Ark. 645; 58 Fed. 437; 60 Fed. 151; 65 Ark. 333.

*St. John Waddell, Quarles & Moore* and *Rose, Hemingway & Rose,* for appellee in reply.

Payments made in the course of general dealings are to be applied to the extinguishment of the oldest indebtedness. 30 Ark. 75; 47 Ark. 111; 57 Ark. 595.

McCULLOCH, J., (after stating the facts.)   1. It is contended, on behalf of appellee, that the contract created only a limited guaranty for advances made by the bank to W. B. Lewis & Company to the extent of $3,000, and was exhausted by the first advancement of that sum and payment thereof; or, if it be held that it was a guaranty for the amount of balance due on April 1, 1891, to the extent of $3,000, a payment of that sum after April 1, 1901, discharged the guarantied debt, even though a balance in excess of the $3,000 was left unpaid by

the principal debtor. On the other hand, appellants contend that the contract constituted a continuing guaranty, and that appellee thereby became liable for $3,000 of any balance due the bank from Lewis & Company on April 1, 1891, and was not discharged by payments made by Lewis & Company, either before or after that date, so long as any balance remained unpaid. It is stated in 1 Brandt on Suretyship & Guaranty, § 156, that there is no general rule for determining whether a guaranty is a continuing one or not, and that the true rule for construing such contracts is "to give effect to the intention of the parties as expressed in the instrument, read in the light of the surrounding circumstances." That learned author quotes, as illustrative of the subject, the following remarks of Willes, J., in *Heffield* v. *Meadows,* L. R. 4. Com. Pleas, 595: "It is obvious that we cannot decide that question upon the mere construction of the document itself, without looking at the surrounding circumstances to see what was the subject-matter which the parties had in their contemplation when the guaranty was given. It is proper to ascertain that for the purpose of seeing what the parties were dealing about; not for the purpose of altering the terms of the guaranty by words of mouth passing at the time, but as part of the conduct of the parties, in order to determine what was the scope and object of the intended guaranty. Having done that, it will be proper to turn to the language of the guaranty to see if that language is capable of being construed so as to carry into effect that which appears to have been really the intention of both parties." To the same effect, see *White's Bank* v. *Myles,* 73 N. Y. 335.

We think that the law is correctly stated, so far as applicable to this case, in 14 Am. & Eng. Enc. Law, 1140, and numerous authorities in support are there cited as follows: "Where the guaranty contains a limitation as to the amount for which the guarantor will be bound, but contains no limitation as to time, and there is nothing in the circumstances surrounding the execution of the contract to evince a contrary intention, it will, in general, be construed to be a continuing guaranty, and operative until revoked, and the guarantor will not be held liable to the extent of his guaranty, notwithstanding the principal

debtor may have, during the existence of the contract, contracted debts to an amount equal to or greater than the sum named in the guaranty, and paid them. The limit mentioned in the guaranty has reference to the amount of the guarantor's liability, and not the amount of dealing between the purchaser and the one who gives credit." *Mathews* v. *Phelps,* 61 Mich. 327.

In *Fellows* v. *Prentiss,* 3 Den. 512, cited by counsel for appellee, it is said: "Where, by the terms of the guaranty, it is evident the object is to give a standing credit to the principal, to be used from time to time, either indefinitely or until a certain period, there the liability is continuing; but where no time is fixed, and nothing in the instrument indicates a continuance of the undertaking, the presumption is in favor of a limited liability as to time, whether the amount is limited or not."

Our conclusion is that, by express terms of the mortgage, the agreement was for a continuing guaranty for advances made up to April 1, 1891, not exceeding $3,000, and a consideration of the surrounding circumstances and the manifest purpose of the guaranty greatly strengthens that conclusion. It is shown that the principals, who had no capital to do business upon, contemplated business operations which necessarily required the use of thousands of dollars monthly or even daily—large sums were in fact procured from the bank and so used—all of which appellee must have known; and it is entirely unreasonable to presume that the parties meant, by the contract, to impose upon appellee only a liability, which would be discharged in the first transaction between the principals and the bank. If that had been their intention, it would have been useless to incorporate in the instrument any stipulation as to time within which the advances could be made.

We think it is equally plain that no payments made by Lewis & Company discharged appellee as long as any part of this debt remained unpaid.

"A continuing guaranty which limits the amount is not exhausted by advancements for the stipulated amount being made and paid by the principal. A contract to stand good for $1,000 of credit is a guaranty for any balance within this limit, and

not a guaranty limited to such time as the total advancements should equal $1,000; so that, if advancements for $1,000 are made and settled for, the guarantor will be liable for additional advancements, the letter of credit not being revoked." Stearns, Suretyship, § 60; *Hatch* v. *Hobbs,* 12 Gray, 447; *Pratt* v. *Matthews,* 24 Hun, 386; *Douglass* v. *Reynolds,* 7 Pet. 113.

The undertaking of appellee was to guaranty payment of the whole balance due by Lewis & Company on April 1, 1891, not exceeding $3,000; and, so long as any part of this balance remained unpaid, the obligation rested upon appellee to pay it, to the extent of the stipulated amount.

2. It is urged by appellee that a part of the advances was used in payment of pre-existing individual debts of members of the firm, in violation of the terms of the agreement, and that the bank had knowledge of such misuse of funds; also that advances were made by the bank after April 1, 1891. This contention is not sustained by the proof in the record. No advances were made after March, 1891, and the testimony fails entirely to show that the officers of the bank knew, or, under the business method practiced, were bound to know, that checks were drawn to pay individual debts.

3. It was shown that a loss was sustained in a large sum on cotton on account of depreciation in price. Is the bank chargeable with the loss?

The cotton was pledged as collateral security for the debt, and the bank held the warehouse receipts therefor. It held the cotton, therefore, as trustee, and was clothed with such powers and duties with reference thereto as usually follow that relation, and was only liable for any loss resulting from failure to discharge its full duty in performing the trust. In other words, the bank was only liable for loss or depreciation in value, price or quantity occurring by reason of negligence of its officers or agents.

"The creditor who has effects of the principal in his hand or under his control for the security of the debt is a trustee for all parties concerned; and if such effects are lost through the negligence or want of ordinary diligence of the creditor, the surety is discharged, to the extent that he is injured, the same as if the effects had been lost by the positive act of the creditor.

In such case he is bound to be diligent in preserving such effects, to the same extent that any other trustee, similarly situated, is bound to use diligence. The kind of diligence required will be governed by the circumstances of each particular case." 2 Brandt, Sur. & Guar. § 440; Stearns, Suretyship, § 99; *Grisard* v. *Hinson,* 50 Ark. 229. But mere delay in enforcing other securities will not discharge a surety or guarantor. *Friend* v. *Smith Gin Co.,* 59 Ark. 86; *Grisard* v. *Hinson, supra;* Stearns, Suretyship, § 99.

We find nothing in the record to justify a charge of negligence against the bank. It is not negligence *per se* to hold cotton from one season to another, especially upon a dull or fluctuating market; and errors of judgment only on the part of the bank officials did not create liability for loss occasioned by depreciation in price.

Appellee alleged, in his amended complaint, that the bank had entered into an agreement with W. B. Lewis & Company to extend the time of payment until November 1, 1891, and hold the cotton until that date, and that on the latter date a like agreement was made for further extension, and that appellee was discharged by such agreement. Appellants in their answer denied the agreement for extension, but admitted that Lewis & Company requested the bank to hold the cotton. There was no proof tending to show an agreement for extension, but Paul Waddell testified that he requested the bank to hold cotton until May 1, 1891, and that neither he nor, so far as he knew, his partner (who died before the commencement of this suit) had ever requested the bank to sell the cotton, or objected to the same being held. The plaintiff made no request of the bank, and testified that he knew nothing of the condition of the account or the holding of cotton until the cotton was sold and demand was made upon him for payment of the $3,000. It is therefore established by both the pleadings and proof that the principals, W. B. Lewis & Company, requested the holding of cotton, and appellee made no demand for its sale, and certainly under those circumstances the bank cannot be held responsible for mere delay in selling the cotton.

4. It is claimed that the contract between Lewis & Company and the bank was usurious, in that more than ten per cent. interest per annum was contracted for and taken.

There is no dispute that the contract was as described by the attorney for the bank in his testimony as follows:

"I prepared three different instruments of writing. One of them was from W. B. Lewis & Company to the bank, whereby they agreed to pay the bank, on all accounts due to the bank, interest at the rate of ten per centum per annum; to deposit with the bank, as collateral security, the warehouse certificates for all cotton which was bought by them, and for which the bank paid. All payments made by them or all moneys realized from the sale of cotton were to be applied as a credit on their account, the warehouse receipts for the cotton to be surrendered by the bank in exchange for bills of lading from the railroads when the cotton was shipped out, and the bills with the draft for the proceeds to be delivered to the bank, and to be credited to the account of W. B. Lewis & Company, less the discount of exchange on the bank. The account was to be balanced at the end of every month, and the interest on the daily balance due from them charged with the interest.

This contract provides for charging of the highest lawful rate of interest, and that the rate should be computed monthly on the average daily debit balances, and charged in the account. The bookkeeper of the bank testified that this method was followed from the date of the contract. Was this usury?

The compounding of interest, provided the rests or periods for compounding are not so frequent as to indicate an intention of evading the usury laws, is not usurious. *Grider* v. *Driver,* 46 Ark. 50; *Magruder* v. *State Bank,* 18 Ark. 9; *Wallis* v. *Lehman,* 36 Ark. 569; *Turner* v. *Miller,* 6 Ark. 463; Tyler, Usury, p. 243. The agreement here, however, was not one for compounding the interest, but for the monthly payments of interest. The authorities, with practical unanimity, hold that this may be done. 29 Am. & Eng. Enc. Law, 492, and cases cited: *Hatch* v. *Douglas,* 48 Conn. 116; *Briggs* v. *Iowa Sav. B. & L. Assoc.* 114 Iowa, 232; Tyler, Usury, 243. This was no more than taking interest in advance, which has been held by this court to be lawful and not usurious. *Bank of Newport* v. *Cook,* 60 Ark. 288; *Vahlberg*

v. *Keaton,* 52 Ark. 534. The contract in this case contemplated large transactions daily between Lewis & Company and the bank, and that the account kept by the bank would show entries of many thousands of dollars monthly, both debits and credits. The operation of a business of buying and selling cotton necessarily contemplated this, and it is unreasonable to presume that the parties expected the monthly computation of interest to exceed the credits on the account from month to month, so that there would remain any balance due on interest to be added to the principal. Under the statutory rule of partial payments, the credit went first in discharge of the interest; and, in the very nature of the business, if the debtors made substantial sales of cotton during any given month, as was evidently contemplated, the proceeds would exceed the interest charged for the month.

The account of the bank, exhibited in the record, shows total debits against Lewis & Company from the beginning of the account to April 1, 1891, amounting to the sum of $228,239.68, and total credits amounting to the sum of $204,472.62. It shows credits in large sums, resulting from sales of cotton during each month. So it follows that the monthly compounding of interest was not reasonably in contemplation of the parties, nor was it done in fact.

The argument of learned counsel for appellee proceeds upon the assumption that the agreement and arrangement between Lewis & Company and the bank fixed April 1, 1891, as the day of payment, and that meanwhile interest was to be computed monthly, and added in as principal and compounded. This is not correct, and is not thus shown in the testimony as to the contents of the written contract, nor in the methods practiced in the dealings between the parties thereunder. On the contrary, the contract provided that all payments made by Lewis & Company and proceeds of sale of cotton from time to time were to be applied on the account, and the account shows that sums largely in excess of the interest were so applied each month.

In *Hatch* v. *Douglas,* 48 Conn. 116, where a broker, according to custom, charged interest monthly, computed on balances, it was held that this was not usury. The court said: "The contract in its terms is silent on the subject of interest. It

is only because the contract was to be performed in conformity with the uniform and established usage of brokers in New York that this claim has any foundation. It will be observed that the usage does not necessarily call for compound interest. If dealings do not extend beyond the period of one month, or, if the monthly balances are paid, there is no compound interest. It is only where dealings continue from month to month that it is called for. The question, then, is this: Is a contract usurious which is legal on its face, but which is to be performed according to a local custom, when that custom in one contingency calls for compound interest? We think not. The vice of usury is not certain; it is only possible."

In *Timberlake* v. *First National Bank,* 43 Fed. 231, it was held that charging interest on monthly balances due on account was not usury. "Usury will not be inferred where, from the circumstances, the opposite conclusion can be reasonably and fairly reached." *Leonhard* v. *Flood,* 68 Ark. 162; *Berdan* v. *Trustees,* 47 N. J. Eq. 8: Webb, Usury, p. 481.

We find nothing in the contract, or in the dealings between the parties, to sustain a plea of usury.

5. It is contended that the purchase by Trieber was for the bank, and that the bank could not purchase at the foreclosure because of the trust relation in which it stood, as holder of the mortgage lien, toward the mortgagor. Counsel cite decisions of this court holding that a trustee cannot purchase property of the *cestui que trust.* It is sufficient to say that appellee cannot be heard in the court of equity to ask a cancellation of the sale on that account without paying or offering to discharge the obligation secured by the mortgage. "He who seeks equity must do equity." 1 Pom. Eq. Jur. § 392; 2 Jones, Mortg. § 1876a; *Stallings* v. *Thomas,* 55 Ark. 326; *Garland* v. *Watson,* 74 Ala. 323.

Moreover, in the pleadings and proof no attack was made upon appellant's title on this ground, and the question cannot be raised here for the first time.

The cause is reversed with directions to enter a decree dismissing the complaint for want of equity.

WOOD, J., concurs in the judgment only.

HILL, C. J., (dissenting). The holding of cotton for thirteen months on a rising or fluctuating market, resulting in a loss of $4,000, ought not to be charged to the surety, but the bank should be held to the value of the cotton at the time the guarantied debt became due, towit, on April 1, 1891. As to the method of paying interest, the contract as a whole did not contemplate monthly payments of the advances. It evidently was not expected. The bank was to advance for the cotton season, and it was not expected that monthly balances should be paid until the end of the season, and therefore the adding in of monthly interest to the sum due, and the total to bear interest thereafter till due, is usurious. If usurious, being a debt to a national bank, the penalty would be a purging of the interest from the account, instead of a forfeiture of principal. In these points I do not concur in the opinion, and think that the case ought to be reversed, and the accounts stated accordingly. Probably the result would be the same, but I think the accounts should be so stated before final judgment.