CHICAGO BUILDING & MANUFACTURING COMPANY v. STOKER.

Opinion delivered March 27, 1911.

1. PLEDGE—RIGHT OF PLEDGEE TO ENFORCE.—Where subscriptions to the capital stock of a corporation, amounting to $7,400, were pledged to a promoting company to secure an indebtedness of $6,500, and the promoting company seeks to recover on one of such subscriptions, the burden is on it to prove that its claim against the corporation has not been paid, as the residue of the stock subscriptions, after paying the $6,500, would belong to the corporation. (Page 478.)

2. SAME—RIGHT OF PLEDGEE TO ENFORCE—EVIDENCE.—Where a contract pledging the stock subscriptions of a proposed corporation stipulated that, after the secured debt was paid, the corporation should organize

under the State laws, the articles of incorporation were admissible, in an action to enforce such pledge, as tending to show that the debt for which the pledge was given had been paid, and hence that the pledgee had no right to recover on the pledge. (Page 478.)

3.  SAME—RIGHT OF PLEDGEE TO ENFORCE—EVIDENCE.—Where a pledge of stock subscriptions in a proposed corporation stipulated that stock subscriptions in excess of the debt secured might be obtained, and that any remaining subscriptions after payment of such secured debt should be assigned to the corporation for a working capital, and the evidence showed that subscriptions in excess of such amount were secured, the record in a suit brought by the pledgee against one of the subscribers to stock was admissible in a suit against another stock subscriber as tending to prove that the pledge had been satisfied. (Page 479.)

4.  SAME—EFFECT.—Under a pledge of the subscriptions to stock of a proposed corporation to pay a debt incurred by the promoters in a sum less than the subscriptions, the pledgee was entitled only to have its claim satisfied, and could not thereafter maintain an action to recover unpaid subscriptions. (Page 480.)

Appeal from Monroe Circuit Court; *Eugene Lankford,* Judge; affirmed.

### STATEMENT BY THE COURT.

The Chicago Building & Manufacturing Company, on the 27th day of January, 1909, filed its suit in the justice of the peace court of Brinkley Township against J. A. Stoker to enforce the payment of a subscription by J. A. Stoker to the Brinkley Creamery Association. The amount to which J. A. Stoker had subscribed to the Brinkley Creamery Association was one share, amounting to one hundred dollars, and the suit was to enforce the payment for his stock in the Brinkley Creamery Association.

On appeal to the circuit court, verdict and judgment were rendered in favor of appellee, and this appeal was duly taken. The appellant attached to the complaint the contract on which the suit was brought. Appellee did not answer, nor did he file affidavit denying the genuineness of the contract upon which the suit was brought. Appellant read in evidence the contract sued on, the material parts of which are as follows:

"That the first party hereto, until full and final payment of this contract, is a voluntary association of persons in and around the city of Brinkley, county of Monroe, and State of Arkansas,

now known as the Brinkley Creamery Association. This association will subsequently organize itself into a going corporation to own and conduct the creamery business as contemplated herein. The second party hereto is the Chicago Building & Manufacturing Company of Chicago, county of Cook and State of Illinois. On the 31st day of August, A. D. 1907, the said parties executed the following contract, to-wit: In consideration of the entire purchase price of six thousand five hundred dollars, which the first party herein pledges itself to pay in cash or equivalent note as hereinafter specified, second party and successors agree as follows: To devise, erect and equip a butter factory, and deliver title to said factory on receipt of price at any time within ninety days from date of final approval of said contract, unavoidable accidents and delays excepted.

"First party and successors further agree as follows: On notice from second party to appoint a building committee, consisting of not more than five (5) persons, with conclusive authority to represent first party from date of appointment till final settlement and permanent organization of the future corporation. Within three (3) days thereafter, said committee, at expense of first party, is to procure and purchase, in fee simple, suitable level land with good legal title, and to furnish thereon in time for the builder suitable water for direct connection with pump for the needs of said factory, and properly assign and describe said site to second party, to be held in trust for first party till full discharge of this contract agreement by first party. First party will inspect work and material during construction, and will specify in writing to second party any defects therein, if any, at occurrence, to be remedied within a reasonable time. At date of delivery said committee shall meet with a representative of second party and together compare the details of said factory, and if it is in substantial accordance with the within contract and specifications, with the machinery fixtures set up in a workmanlike manner, second party's discharge of this contract is complete and payment is due thereunder, and second party or successors may receive, receipt for and apply on the contract price any partial payment that any subscriber may desire to pay, and any subscriber who shall pay his subscription in cash or shall execute an equivalent bankable note satisfactory to second party

or successors, at legal rate of interest, shall be given a receipt in full of any further personal liability. For any unpaid or deferred balance of subscription, all delinquent subscribers are jointly liable, and the first party agrees that any failure in any of its covenants may be construed as a joint and total breach of the within contract.

"Stock subscriptions to said future corporation may be obtained in excess of the above price, but said total subscription shall be held and collected by second party until such time only as full cash payment has been made as above, and, when any payment is deferred, all necessary costs of collection and discount may be included, should second party so desire.

"Any remaining subscription or note balance, after said creamery association's entire indebtedness to second party has been so paid, shall be duly assigned to the said corporation for a working capital.

"Any remaining subscription or note balance, after said creamery association shall organize a co-operative society under State law, fixing aggregate amount of stock at not less than the amounts subscribed hereto, represented by stock certificates of $100 each. Said certificates will then be issued to each paid-up stockholder in proportion to his interest, it being specially agreed that there can be no default, withdrawal or transfer of subscription or stock until lawfully entered on the books of said corporation by its regularly elected officers. Pursuant to the laws of this State and these conditions, it is agreed that each stockholder shall be liable for the amount of stock subscribed by him and no more.

"Second party further agrees to provide, on written request and at the expense of future corporation, an experienced butter maker for one year, more or less, who may be hired if desired and approved by said corporation.

"It is agreed that one or more of these printed contract forms may be placed in the hands of special agents, representing both parties, for the purpose only of obtaining subscriptions hereto, and, when all such forms shall be attached together and approved by said second party, they shall constitute the only contract between said parties, with nothing supplementary unless actually attached hereto, printed or written.

"No change in parties, person, purpose, name or business

shall affect or impair the covenants or this contract, and the guarantor of faithful performance by second party of this contract has full authority to collect the contract price of same at the date for payment aforesaid.

"It is agreed between the parties hereto that each subscriber is only responsible for the amount subscribed by him individually, not jointly, and this contract is changed accordingly.

"The within read, approved and executed on the date first written.

"By Subscribers to the Brinkley Creamery Association."

Then follows the names of more than fifty parties who signed the contract, the names being signed under the following form:

| Names of Subscribers | No. of Shares. | Amount of Stock. |
|---|---|---|

In the column headed "Names of Subscribers" is found the names of the various parties, including that of appellee, and opposite his name and under the head of "No. of Shares" is "one," and under the head of "Amount of Stock" is "$100."

The contract concludes as follows:

"Date of final approval by second party, 14th day of September, 1907.

"Faithful performance by second party guaranteed........
Guarantor.

"The Chicago Bldg. & Mfg. Co. (Second Party)
                    "By Jessee Sigsworth, Agt.
                    "R. E. Sturgis."

Appellee was called as a witness for appellant, and testified that he signed the subscription list for stock in the Brinkley Creamery Association, that the Brinkley Creamery Association was not organized when he signed the paper. He was to pay the creamery company $100 if they got it up.

Witness Brown on behalf of appellant testified that he was one of the persons who assisted in the organization of the Brinkley creamery, and was one of the stockholders. "The creamery was erected and accepted. Appellant erected the creamery according to its contract, and it was accepted by a committee at the first stockholders' meeting. It was afterwards put in operation, and run for five or six months—from April 1 to October 1, 1908. The contract was signed before the creamery association

was incorporated. The association was incorporated after the building was erected and the machinery was installed." He further testified as follows:

"I cannot say why all these brads are in the contract; I had not noticed them, but that is the same contract I signed. I do not know whether Mr. Stoker signed it or not. The brads are in two or three different places, showing that the contracts were all bradded on the back. I think there was about $7,400 in all subscribed. We were to pay them $6,500, and when they did their work they notified us, and it was accepted and turned over to us, and then the corporation was organized. I think they would not turn over the plant until it was paid for. They turned it over to us in consideration of the contract being signed for $6,500. There was a little more than that subscribed, and we were to use the balance in operating the creamery, but we did not get anything. The creamery association did not have but one man's note for collection. That was Mr. O'Harra's. The contract was signed by the different parties agreeing to pay appellants the sum set out sometime before the organization of the creamery association. The appellant was to collect up to $6,500. I do not know whether they collected that amount or not. They collected mine."

Over the appellant's objection, appellee introducd in evidence the record in the suit of Brinkley Creamery Association *v.* O'Harra, showing that the creamery association claimed the note given by O'Harra for his stock subscription to said company.

Appellee also over appellant's objection introduced in evidence the articles of incorporation of the Brinkley Creamery Association, showing that the name of appellee did not appear on same anywhere.

Exceptions were duly saved to the rulings of the court in permitting the above as evilence. At the request of appellant the court gave the following instruction:

"1. The failure of defendant to be included among the number of stockholders incorporating the creamery or butter company is no defense to this action. If you find from the evidence that defendant subscribed and agreed to pay $100 to be represented by stock in the future corporation, and that the $100 was to be paid to the plaintiff upon the completion of the plant, instal-

lation of the machinery, etc., and you find from the evidence that such contract was complied with by plaintiff and the creamery plant was accepted, it is immaterial that the name of defendant does not appear among those who organized the Brinkley Creamery Association."

The court refused to give request of appellant for a peremptory instruction; an exception was duly saved. At the request of appellee the court gave the following:

"1.   It devolves upon the plaintiff to prove by a preponderance of the evidence that the plaintiff has not been paid under its contract.

"2.   If the plaintiff delivered the building and material to the Brinkley Creamery Association, they are presumed to do so under the contract, and can not recover unless they comply with their contract."

Appellant duly objected to the requests, and excepted to the ruling of the court in granting them.

*G. Otis Bogle* and *Manning & Emerson,* for appellant.

1.   The court erred in admitting the record in the O'Harra suit, and the articles of association of the Brinkley Creamery Association.   90 Ark. 104.

2.   Where a writing, etc., if filed with, met and referred to in a pleading, it may be read in evidence as genuine against a party unless he denies its genuineness under oath before the trial.   Kirby's Digest, § 3108.   The court erred, therefore, in giving instructions 1 and 2.   The burden was 'on appellee.   65 Ark. 320-4.

3.   It is not error to direct a verdict if there is no question of fact to submit to the jury.   69 Ark. 562-8.   A condition resting in parol cannot be engrafted on a written stock subscription.   92 Ark. 504.   The mutuality of an agreement being the consideration, it can not be varied nor contradicted by parol testimony, nor an oral condition engrafted upon it.   20 Ark. 443; 1 Cook on Corp. (6 ed.) § § 77, 81, 137; 1 Morawetz on Corp. 77; 2 Beach Priv. Corp. 531; 10 Cyc. 413-415; 26 A. & E. Enc. Law 911, and cases cited; 1 Cook on Corp. 531.

4.   The verdict is against the law and the evidence.

*Thomas & Lee,* for appellee.

1. The articles of incorporation of the Brinkley Creamery Association were competent to show that the pledge of $6,500 had been paid. When paid, appellee owed appellant nothing. The record in the O'Harra suit was also properly admitted for the same reason. The jury found that appellant had been paid; there was evidence to sustain the finding, and this court will not disturb the verdict. 75 Ark. 111; 84 Ark. 406; 85 Ark. 193; 90 Ark. 103.

2. The pledge was merely a limited guaranty, and when the amount was paid all the guarantors were discharged. 136 Mass. 337; 72 Vt. 9; 137 Cal. 253; 6 Ohio Dec. (reprint) 819; 8 Am. L. Rec. 348; Rice L. (S. C.) 126; 23 So. Car. 354; 10 Wyo. 135; 11 Col. 50; 59 Me. 358; 72 *Id.* 345; 48 Minn. 3; 82 *Id.* 603; 74 Ark. 241.

WOOD, J., (after stating the facts). 1. Appellee did not deny the contract sued on, nor did he allege that he had paid his subscription to the capital stock of the Brinkley Creamery Association. His defense, as disclosed by his prayers for instructions, was that the burden was on the appellant to prove that it had complied with its contract, and that it had not been paid by the Brinkley Creamery Association.

Under the contract appellee would owe appellant nothing, even though he had not paid his subscription to the Brinkley Creamery Association, provided the latter had paid appellant the sum of $6,500, the amount due, when appellant had performed the contract on its part. Under the terms of the contract no subscriber to the capital stock of the Creamery Association was due appellant anything after it had been paid the sum above specified, including necessary costs of collection and discount. The remaining subscriptions or note balance after that belonged to the Brinkley Creamery Association, and not to appellant. Therefore, before appellant could recover from appellee, it devolved upon it to show, not only that it had complied with the contract, but also that the sum due it thereunder of $6,500 had not been paid. The failure of appellee to deny the existence of the contract sued on was not an admission on his part that it had been complied with by appellant. And, inasmuch as the contract sued on showed that appellant might have been paid the sum due it

under the contract by other subscriptions to the capital stock of the creamery company, the burden was on appellant to show that it was not so paid before it could hold appellee liable; for, if the creamery association had paid the appellant, through other subscribers, the amount due, appellee would not owe appellant anything, even though he had not paid his subscription. In that case, under the contract in suit, appellee would owe the Brinkley Creamery Association, and not appellant. Therefore the court did not err in giving appellee's prayers numbered 1 and 2.

2. The court did not err in admitting in evidence the articles of incorporation of the Brinkley Creamery Association. The contract provided:

"After payment and delivery has been made as above, said creamery association shall organize a co-operative society under State law fixing the aggregate amount of stock at not less than the amount subscribed hereto, represented by stock certificates of one hundred dollars each."

The articles of incorporation tended to show that payment of the contract price of $6,500 had been made by the subscribers to the capital stock of the Brinkley Creamery Association because under the above clause the creamery association was not to be organized until "after payment and delivery."

The court did not err in admitting the record in the suit of the Brinkley Creamery Association *v.* O'Harra.

The contract contained the following clause: "Stock subscription to said future corporation may be obtained in excess of the above price, but said total subscription shall be held and collected by second party until such time only as full cash payment has been made as above, and, when any payment is deferred, all necessary costs of collection and discount may be included, should second party so desire. Any remaining subscription, or note balance, after said creamery association's entire indebtedness to second party has been so paid, shall be duly assigned to the said corporation for a working capital."

There was evidence tending to prove that there were subscriptions to the stock of the creamery association amounting to $7,400. Under the above clause, the total subscription was to be held by appellant until such time only as full cash payment had been made, then the residue of subscriptions was to be assigned

to the Brinkley association. The record of the suit of the Brinkley association against O'Harra therefore tended to prove that full cash payment had been made to appellant, otherwise under the contract the O'Harra note for subscription to stock would not have been assigned to the Brinkley Creamery Association. At least, this was evidence competent for the jury to consider as tending to establish the fact that appellant had been paid.

Under the contract the pledge of the subscriptions amounting, as the jury might have found, to $7,400, to pay the less sum of $6,500 to the appellant was tantamount to a limited guaranty; and when the amount guaranteed was paid, as the jury found, the subscribers—guarantors—were discharged, at least, of any liability to appellant. See *First Nat. Bank* v. *Waddell,* 74 Ark. 241; *Carson* v. *Reid,* 137 Cal. 253; *Knowlton* v. *Hersey,* 76 Me. 345; *Cutler* v. *Ballou,* 136 Mass. 337; *Reed* v. *Fish,* 59 Me. 358; *Cushing* v. *Cable,* 48 Minn. 3; *Frost* v. *Weathersbee,* 23 S. Car. 354.

The judgment is affirmed.