**COMMERCIAL CREDIT EQUIPMENT CORPORATION**

v.

**J. R. HATTON and Frank J. Darby.**

**No. CA 3–75–1131–C.**

United States District Court,
N. D. Texas,
Dallas Division.

April 15, 1977.

Larry F. Amerine, Biggers, Lloyd, Biggers, Beasley & Amerine, Dallas, Tex., for plaintiff.

Thomas F. Hooker, Jr., Felton, Hooker & Giddens, Houston, Tex., for Frank Darby.

F. B. Lloyd, Jr., Lloyd, Lloyd, Ellzey & Lloyd, Alice, Tex., and Philip C. McGahey, Bagby, McGahey, Ross & DeVore, Arlington, Tex., for J. R. Hatton.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

Plaintiff, Commercial Credit Equipment Corporation, brought this diversity action against Defendants Hatton and Darby seeking to recover the balance owed on an aircraft security agreement executed by Darby and purchased by Plaintiff from Hatton on August 16, 1974. In consideration of Plaintiff's purchase of the security agreement, Hatton executed an "Aircraft Repurchase Agreement" making Hatton a guarantor of payment. After suit was initiated, Hatton filed a cross-action against Darby as principal obligor on the security agreement. Upon trial to the Court, we are of opinion for the reasons set forth below that Defendants Hatton and Darby are jointly and severally liable to Plaintiff for the outstanding balance owed on the security agreement and that Defendant Hatton should prevail in his action over against Defendant Darby.

This action arose out of a sales transaction in which Defendant Hatton, an aircraft dealer d/b/a South Texas Aircraft, negotiated the sale of a used Beech aircraft to Defendant Darby. Financing for the sale was arranged through Plaintiff Commercial Credit Equipment Corporation whose "Aircraft Security Agreement" form was used in the August 16, 1974, closing. The sales price of the airplane was $40,750.00 with Darby making a $5,000 down payment and agreeing to pay the remaining principal and interest in sixty monthly installments of $811.91 each commencing September 15, 1974.

The reverse side of the Aircraft Security Agreement provides, among other things, that seller has a security interest in the aircraft until all sums due are paid; that the security agreement may be assigned; and that purchaser (Darby) will keep the aircraft in good repair, not lease or rent it without written consent of seller, and make payments promptly. Defendant Hatton, as seller, executed the form at the bottom of the Security Agreement assigning it to Plaintiff. In addition, Hatton executed an "Aircraft Repurchase Agreement" by which he agreed to purchase the aircraft upon repossession or to pay Commercial Credit Equipment Corporation the difference between the sales price of the repossessed aircraft and the amount still owing on the security agreement.

Mr. Hatton soon had cause to regret the obligations he had undertaken in the repurchase agreement as Defendant Darby was late in making his first payment. In November of 1974, Mr. Hatton's cause for concern increased upon his discovery that the aircraft was being used for commercial purposes by a private air carrier, Airborne Messenger Service. As early as November 26, 1974, Mr. Hatton telephoned agents of Plaintiff advising them of this use of the aircraft, a use which strongly implied that Darby had leased or rented the aircraft in violation of the Security Agreement. By letter of December 26, 1974, and by telephone call of January 13, 1975, Hatton repeated his warnings to Plaintiff that the aircraft was being subjected to commercial use and that such use by the particular firm involved would, in his opinion, lead to a very rapid depreciation in the value of the airplane. On February 3, 1975, Hatton telephoned an agent of Plaintiff to advise that the aircraft was at Love Field in Dallas, Texas, less than a mile from the offices of Commercial Credit Equipment Corporation and that it bore the decal of Airborne Messenger Service. Hatton urged Plaintiff's agent to repossess the airplane at once. It was Mr. Hatton's undisputed testimony that as of February 3, 1975, the aircraft still had a market value equal to the amount owing on the security agreement. Plaintiff had independent knowledge of the use of the aircraft by Airborne Messenger Service and accepted at least one payment from Airborne Messenger Service. There is no evidence, however, that agents of Plaintiff had any knowledge, other than the contentions of Mr. Hatton, that the aircraft was being subjected to excessive use without proper maintenance. Further, although several payments were late, they were made for all months through February of 1975.

Despite the warnings of Hatton, Plaintiff did not repossess. Finally, on or about April 3, 1975, the plane was abandoned at the facilities of Airborne Messenger Service at Hobby Airport in Houston, Texas. Due to its heavy commercial use and lack of proper maintenance in the interim, the aircraft was in virtually worthless condition. Plaintiff took possession of the aircraft, and after Hatton's refusal to repurchase, sold the aircraft for $5,000, the agreed fair market value of the plane. Plaintiff then made demand upon Hatton and Darby for payment of the balance owing on the security agreement. No payment was made by either Defendant.

Although he was served in this action and made appearances to file preliminary motions to dismiss and for more definite statement, Defendant Darby failed to appear further, failed to answer Plaintiff's complaint or Hatton's cross-complaint after his preliminary motions were denied, and failed to appear at trial even though he was duly notified of same. As the evidence is clear that Darby is the obligor on the security agreement, Plaintiff is entitled to judgment against Darby and Hatton, jointly and severally, in the amount of $33,553.84. In addition, because the security agreement, but not the repurchase agreement, provides for attorneys' fees, Plaintiff is entitled to judgment against Defendant Darby only for its reasonable attorneys' fees which we find to be $3,500. Finally, Hatton as surety must prevail in his action over against Darby for indemnity and contribution.

■ The only real question in this litigation is whether Defendant Hatton's surety obligations under the Aircraft Repurchase Agreement were discharged by the failure of Plaintiff to repossess in light of Darby's lateness in making payments and Plaintiff's knowledge that Darby was permitting the aircraft to be used for commercial purposes. Hatton asserts that he should be discharged under the terms of § 3.606 of the Business and Commerce Code, V.A.T.S., the Uniform Commercial Code as adopted by the State of Texas. With respect to § 3.606(a)(1), we are unable to see how this is applicable in this case as there is no contention that Plaintiff either released Darby, or agreed not to sue Darby, or discharged Darby from his obligations under the security agreement. Further, we are unable to find that Plaintiff's delay in repossessing the aircraft constitutes an agreement to suspend the right to enforce the instrument against Darby within the meaning of § 3.606(a)(1). In addition, the protections afforded by § 3.606(a)(1) may be waived, *C.C.E.C. v. Southeastern Uni-Loader, Inc.*, 134 Ga.App. 156, 213 S.E.2d 536, 16 U.C.C.Rep. 1060 (1970), and it would seem that Hatton did waive such protections upon signing the repurchase agreement which, in part, provided that:

"CCEC may, without notice to Undersigned [Hatton] and without releasing Undersigned from any liability hereunder, extend, renew, rewrite the Instrument and release any rights thereunder."

Hatton's primary argument is that he should be discharged under § 3.606(a)(2) which provides as follows:

"The holder discharges any party to the instrument to the extent that without such party's consent the holder . . . unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

There is a good question at the outset as to whether the security agreement in question is negotiable and therefore whether § 3.606 is applicable in any respect to this transaction. We are unable to see that the question of negotiability requires resolution, however, as it would not appear that § 3.606(a)(2) permits discharge of a surety on the facts present in this case.

First, the question of impairment of collateral arises only where the holder is in possession of the collateral. While there are numerous cases on the duty of creditors in possession of collateral, counsel for Hatton has not cited us to and we are unable to find any Texas case in which a surety has been discharged for impairment of collateral not in the possession of the creditor. There are situations, such as where the creditor alone can take the action necessary for preservation of collateral (recordation of a lien, for example), in which a discharge may be ordered for inaction of the creditor, but nonfeasance of a creditor will normally result in discharge only where the creditor is in possession of the collateral.

Further, we are unable to find in the wording of the U.C.C. any evidence of an intention to impose duties upon creditors not in possession of collateral. Comment 5 to § 3.606 refers the reader to § 9.207 for guidance in deciding when a holder's actions in dealing with collateral may be "unjustified"; § 9.207, by its own terms, deals exclusively with situations where the holder is in possession of collateral.

Because § 3.606 is said to codify pre-Code suretyship law, 43 Texas L.Rev. 453, we look to more venerable Texas cases for further guidance as to suretyship defenses. In *Ramsey v. Wahl, et al.*, 235 S.W. 838 (Tex. Com.App.1921), The Commission of Appeals of Texas, in an opinion adopted by the Texas Supreme Court, quoted with approval the principle laid down in the case of *Dillard v. Chandler*, Tex.Civ.App., 157 S.W. 303, 304:

". . . where the pledged property is not committed into the hands of the mortgagee, but is permitted to remain with the mortgagor, the mere indulgence or even negligence in the matter of delaying a foreclosure through legal proceedings, even though it results in the

loss of the security, does not have the effect in law to release the sureties on the debt . . . The rule may be, and is, different where the mortgaged property is in the possession and under the control of the mortgagee, or where he does some affirmative act in respect to which the sureties are at such disadvantage as to be unable to protect themselves by a compliance with their contract to pay, and thus be subrogated to the mortgagee's right, and the mortgaged property is in consequence thereof lost to them."

While this Court is frankly concerned about the failure of the Plaintiff to repossess under the facts in this case, we are able to understand and agree with the widespread reluctance of courts to impose upon creditors a duty to act affirmatively to prevent the impairment of collateral not in their possession; the imposition of such a duty flies in the face of commercial realities. If a creditor were under a duty to repossess collateral upon the request of a surety, for example, the note holder in an automobile financing transaction might be required to investigate every allegation by a surety that the debtor in possession of the collateral is not having the vehicle lubricated regularly or has not added anti-freeze to the radiator; failure by the creditor to investigate each such allegation and to repossess if necessary could result in discharge of the surety should it later develop that the vehicle is abandoned in worthless condition due to the failure of the debtor to have the vehicle lubricated and protected against freezing. In addition to the practical problems involved in such a system, it would not appear to be sound public policy to encourage creditors and sureties to follow debtors about to insure that the value of collateral in their possession is not deteriorating.

■ To the extent that a surety feels insecure and believes a debtor is in default, he is always entitled to pay off the indebtedness, be subrogated to the rights of the creditor, and then repossess—taking upon himself the significant risks of a wrongful repossession or of committing a breach of the peace in connection with the repossession. The rule that a surety cannot compel a creditor to repossess when the surety feels insecure is but an application in another setting of the saying sometimes heard in the days before central heating: "Let the one who complains of the cold fetch in the firewood."

■ Hatton also relies for discharge upon § 34.02, Business and Commerce Code, V.A.T.S., which provides that:

(a) When a right of action has accrued on a contract for the payment of money or performance of an act, a surety on the contract may require by written notice that the obligee forthwith sue on the contract.

(b) A surety who gives notice to an obligee under Subsection (a) of this section is discharged from all liability on the contract if the obligee

(1) is not under legal disability; and either

(2) fails to sue on the contract during the first term of court after receiving the notice, or during the second term showing good cause for the delay; or

(3) fails to prosecute the suit to judgment and execution.

We are unable to find that § 34.02 is applicable to this action as Hatton at no time requested Plaintiff to sue on the contract. Further, even if Hatton's requests that Plaintiff repossess could be deemed to constitute a request to sue under § 34.02, it would appear that Plaintiff did bring suit against Defendant Darby fairly promptly and that Plaintiff has diligently prosecuted this action through to judgment. Since Texas no longer follows the practice of holding "terms of court," as that term is used in § 34.02(b)(2), we presume that suit must be brought within a reasonable time; Plaintiff commenced this action on September 19, 1975, within approximately six months from the due date of the March 15, 1975, payment which was never made, with-

in approximately four months from the May 9, 1975, date that the second demand was made upon Hatton to perform under the repurchase agreement, and within three weeks of the October 30, 1975, date upon which the repossessed aircraft was sold by Plaintiff. It is difficult to say that such a delay is unreasonable.

In conclusion, what appears on its face to be a harsh rule in favor of creditors is, upon closer analysis, an ancient rule based on commercial necessity. Its application in this case is tempered by the fact that the surety here is not some gullible friend who agreed to take on suretyship obligations as a personal favor to the debtor; rather, Mr. Hatton is an experienced businessman who expected to benefit financially from this loan transaction which made possible the sale of an expensive aircraft. Plaintiff had reservations about extending the credit involved in this transaction and agreed to finance the aircraft only upon condition that Mr. Hatton act as guarantor. Hatton agreed to do so and in signing the repurchase agreement said, in effect, "If anything goes wrong with this deal, I will make it good." It did and he must.

Counsel for Commercial Credit Equipment Corporation is requested to prepare and submit appropriate form of judgment, approved as to form by counsel for Hatton.