Claude MOORE and Johnny Moore v. LUXOR (NORTH
AMERICA) CORPORATION

87-223                                          742 S.W.2d 916

Supreme Court of Arkansas
Opinion delivered January 19, 1988

*Wright, Lindsey & Jennings*, for appellants.

*Rose Law Firm, A Professional Association*, by: *David L. Williams*, for appellee.

DAVID NEWBERN, Justice. The Appellee, Luxor (North America) Corporation, prevailed in its action against the appellants, Claude Moore and Johnny Moore, for breach of their personal guaranties with respect to credit extended to a business operated by them. Both Claude and Johnny Moore, who are not related, answered Luxor's complaint, but Claude Moore did not defend further. In this appeal, Johnny Moore contends that Luxor should not have prevailed because it is a Washington corporation which has not qualified to do business in Arkansas and thus is not entitled to enforce its contract in our court because of the penalty provision of the Wingo Act, Ark. Stat. Ann. § 64-1202 (Repl. 1980). He also contends the trial court erred in finding that Luxor had no duty to repossess its collateral and thus reduce his liability under his guarantee agreement. We affirm the judgment in favor of Luxor, as we conclude the trial judge was correct in ruling, based upon the evidence before him, that the Wingo Act provided no defense, and in holding that Luxor owed no duty to its guarantors to repossess collateral prior to proceeding to enforce the personal guaranties.

Claude and Johnny Moore formed a business, located in Little Rock, to sell television satellite reception equipment. Luxor agreed to allow the Moores' company, Moore Distributing, Incorporated, to become its distributor but required a security

agreement as well as personal guaranties on the part of Claude and Johnny Moore before shipping equipment to them on credit.

Luxor sold equipment to Moore Distributing, Inc., from July 3, 1985, to October 1, 1985. On October 10, 1985, Claude and Johnny entered an agreement dissolving their business relationship. Johnny Moore testified that the agreement provided that he would take some of the equipment and be entitled to take over the secondary operation they had established in Jonesboro, and Claude Moore was to remain with the business in Little Rock. As between Claude and Johnny, Claude was to be responsible for the company's outstanding obligations to Luxor, although their written agreement recognized they both remained legally liable to Luxor. Johnny Moore testified that he knew at that time that Claude would not pay Luxor for the equipment, and he called Luxor and told the person in the Luxor office with whom he spoke that he would no longer be responsible for Moore Distributing, Inc., and its obligation to Luxor. He wanted Luxor to pick up its equipment, but Luxor did nothing. He testified he was told by a Luxor employee that Luxor was aware of both sides of "the story" and would continue to do business with Claude Moore. Luxor filed its complaint against Claude and Johnny Moore in February, 1986, alleging breach of their personal guarantee agreements and an obligation of $82,223.98.

Johnny Moore's answer admitted that he executed a personal guarantee agreement, but asserted that he was without sufficient information to know whether the affidavit attached to the complaint was an accurate statement of the Moore Distributing account with Luxor. He also asserted his defense based on the Wingo Act and contended that Luxor had waived its right to proceed against him by failing to pick up its equipment and by sending additional equipment, after notice of his disassociation from Moore Distributing, Inc. Luxor's evidence consisted of the testimony of Robert McGinnes, its chief operating officer. Mr. McGinnes testified that in 1985 he had been called by Claude or Johnny Moore and asked if they could become Luxor distributors in the South. An agreement was reached, and it was decided that because the Moores' company was new, there would be a security agreement and personal guarantees executed by them. The agreements were sent by McGinnes to the Moores, signed in Arkansas, and returned to Washington, whereupon Luxor began

shipping equipment to Moore Distributing, Inc. Mr. McGinnes presented testimony about the invoices showing the indebtedness to his company. On cross examination, he was asked if Luxor had done business with a company named "Digital Satellite" in Arkansas. He replied he was not sure, but was aware that Claude Moore had been associated with that company.

At the close of Mr. McGinnes's testimony, Johnny Moore moved for a directed verdict on the ground that the Wingo Act had been raised as a defense and Luxor had not borne its burden of proof by showing that it was entitled to enforce its contracts in the courts of Arkansas. Luxor's contention in response was that the penalty provision had been raised as an affirmative defense, and the burden of proving that the foreign corporation may not enforce its contracts in Arkansas lies with the party asserting it. At the conclusion of the discussion, the court ruled as follows: "The proof has been, number one, that the plaintiff was contacted by telephone by these defendants and they asked to be permitted to sell the product. I don't really think it is all that close. I'll deny the motion. If I am wrong, you've got it on the record."

After his motion for directed verdict was denied, Johnny Moore testified, as noted above, about his conversations with persons in the Luxor office. He also testified that at the time he parted from his business venture with Claude Moore, and notified Luxor of that fact, there was $39,000 worth of Luxor equipment on hand at Moore Distributing, Inc., and about $15,000 worth which had been shipped to them C.O.D. and was in the hands of United Parcel Service awaiting payment.

Among other instructions, the court told the jury: "If you find that Luxor unjustifiably impaired the collateral then Johnny Moore is absolved of liability only to the extent the collateral has been impaired. Johnny Moore has the burden of proving the unjustified impairment and the extent thereof." The instruction was specifically objected to by Luxor on the grounds that (1) for there to be impairment of the collateral, the collateral must be in the hands of the creditor, and (2) under the terms of the guarantee agreement Johnny Moore had specifically waived the right to participate in the collateral or have Luxor go against it as a precondition of recovery under the agreement.

The jury returned a verdict against Claude Moore in the

amount of $82,223.98 and against Johnny Moore in the amount of $28,000.00. Judgment was entered for joint and several recovery by Luxor against Claude Moore and Johnny Moore for $28,000.00 and against Claude Moore for $82,223.98. Luxor then moved for judgment notwithstanding the verdict, contending that there was no basis for the jury's having entered its verdict against Johnny Moore for less than the full amount of the claim. In his order granting the motion, the judge noted that a secured creditor has no duty to accept collateral in reduction of the debt or to seek to repossess the collateral. Judgment notwithstanding the verdict was entered in favor of Luxor against Johnny Moore for $82,223.98.

### The Wingo Act

Section 64-1202 provides, in pertinent part, that "[a]ny foreign corporation which shall fail or refuse to file its articles of incorporation or certificate . . . cannot make any contract in the State which can be enforced by it either in law or in equity. . . ." Johnny Moore argues that by raising the statutory provision as a defense he placed the burden on Luxor to prove that it had filed its credentials with the secretary of state or that for some reason the provision was inapplicable. That argument is correct, as we have held that raising the act as a defense does place the burden on the corporation to show that it should not be precluded from enforcing its contract in an Arkansas court. *Mielmier* v. *Toledo Scale Co.*, 128 Ark. 211, 193 S.W. 497 (1917). *See also Widmer* v. *J.I. Case*, 243 Ark. 149, 386 S.W.2d 702 (1967). However, we agree with the trial court that the evidence would not support application of the statute so as to preclude Luxor from bringing this action. In the words of the statute, to be precluded from enforcement, the contract must be one made "in this State" by a noncomplying corporation. *Brown Broadcast, Inc.* v. *Pepper Sound Studio, Inc.*, 242 Ark. 701, 416 S.W.2d 284 (1967). The place where the last act necessary to the completion of the contract occurs is the place where the contract is made. *Hough* v. *Continental Leasing Corporation*, 275 Ark. 340, 630 S.W.2d 19 (1982). Although the security agreement and the guarantee agreements were sent by the Washington company to Arkansas to be signed by Claude and Johnny Moore, the final act of acceptance occurred in Washington when credit

was extended on the basis of those agreements. *See Moody* v. *Kirkpatrick*, 234 F. Supp. 537 (1964). We hold that the contracts were not made in this state.

We recognize that this issue is presented in a peculiar procedural posture. The trial judge, by the manner in which he ruled that Johnny Moore was not entitled to a directed verdict, seemed to preclude any further consideration of the Wingo Act penalty despite the fact that it was the burden of Luxor to show that it did not apply. No instruction was presented on the matter, and thus the jury was not allowed to consider it. It was as if Luxor had asked for and been granted a directed verdict on that issue. We find no reversible error here because, given the evidence before the court, it could well have granted Luxor such a directed verdict, and no instruction was sought by Johnny Moore on the Wingo Act issue.

### Impairment of Collateral

In reviewing Luxor's motion for judgment notwithstanding the verdict, the trial court apparently realized his mistake in instructing on impairment of collateral and granted the motion raising the damages against Johnny Moore from $28,000.00 to the full amount sought. No argument has been made on appeal that it was error to grant a judgment notwithstanding the verdict to the party bearing the burden of proof. Rather, Johnny Moore's argument is that Luxor had a duty, which it violated, not to impair the collateral securing the obligation to it of Moore Distributing, Inc. We hold that the trial court ultimately reached the correct conclusion, *i.e.*, that Luxor had no duty to repossess its collateral to protect its guarantor.

Unfortunately, Johnny Moore relies for his authority, on the subject of impairment of collateral, upon our original opinion in a case in which we granted rehearing reaching the opposite result. *Myers* v. *First State Bank of Sherwood*, 293 Ark. 82, 732 S.W.2d 459 (1987), rehearing granted, 293 Ark. 87-A, 741 S.W.2d 624 (1987). In that case we held on rehearing that the bank should not have released its principal obligors from liability thus impairing a guarantor's right of recourse. That holding is not applicable here because we are dealing with impairment of collateral rather than impairment of the guaran-

tor's right of recourse against a third party. Discharge of a surety for impairment of the right of recourse occurs pursuant to Ark. Stat. Ann. § 85-3-606(1)(a) (Add. 1961). Discharge of a surety due to impairment of collateral is an entirely different matter covered by Ark. Stat. Ann. § 85-3-606(1)(b) (Add. 1961). The issue here is whether a creditor who is not in possession of the collateral has a duty to repossess it in the event a surety feels insecure and notifies the creditor of the problem.

We have held that a holder of a promissory note has no duty to accept an offer of the collateral pledged by the maker of the note in lieu of payment. *Storthz* v. *Commercial National Bank*, 276 Ark. 10, 631 S.W.2d 613 (1982). Nor do we believe a creditor should have an obligation to repossess or seize collateral in the circumstances presented here. Luxor has cited a case very similar to the one before us in which it was held that there was no such obligation to protect a surety or guarantor. *Commercial Credit Equipment Corporation* v. *Hatton*, 429 F. Supp. 997 (N.D. Tex. 1977). In that case we find this persuasive language:

> If a creditor were under a duty to repossess, for example, the note holder in an automobile financing transaction might be required to investigate every allegation by a surety that the debtor in possession of the collateral is not having the vehicle lubricated regularly or has not added antifreeze to the radiator; failure by the creditor to investigate each such allegation and to repossess if necessary could result in discharge of the surety should it later develop that the vehicle is abandoned in worthless condition due to the failure of the debtor to have the vehicle lubricated and protected against freezing. In addition to the practical problems involved in such a system, it would not appear to be sound public policy to encourage creditors and sureties to follow debtors about to ensure that the value of collateral in their possession is not deteriorating. [429 F. Supp. at 1001]

The court noted further that a surety who feels insecure can always pay the obligation and be subrogated to the rights of the creditor and then conduct his own repossession of the collateral, running the attendant risk of wrongful repossession which would otherwise be on the original creditor.

■ We hold that a creditor who is not in possession of collateral has no obligation to repossess it for the protection of its guarantor and that the failure to do so is not impairment of collateral as that term is used in § 85-3-606(1)(b).

Affirmed.

GLAZE, J., concurs.

TOM GLAZE, Justice, concurring. I concur. Frankly, I must admit that I am unsure of what this court's case law now holds as it pertains to the enforceability of personal guarantees. In our recent case of *Myers* v. *First State Bank of Sherwood*, 293 Ark. 82, 732 S.W.2d 459 (1987), we held that the Uniform Commercial Code, in particular Ark. Stat. Ann. § 85-3-606(1) (Add. 1961), does not apply to the situation where a person signed a separate guaranty agreement. We then, citing *First National Bank* v. *Waddell*, 74 Ark. 241, 85 S.W. 417 (1905), referred to Arkansas's general suretyship law, stating that a creditor has an obligation to preserve a surety's right of recourse in the collateral. In doing so, we upheld the trial court's decision that Myers caused the wrongful disposal of the collateral which secured the loan he previously guaranteed and, therefore, should not benefit under the state's general surety law. Upon granting a rehearing and reversing ourselves in the *Myers* case, this court merely stated that we placed too much emphasis on Myers's activity as surety rather than on what First State Bank of Sherwood as creditor did with respect to the collateral. *Myers* v. *First State Bank of Sherwood*, 293 Ark. 87-A, 741 S.W.2d 624 (1987). In its rehearing opinion, the court never retreated from its position that the Uniform Commercial Code was inapplicable, and, in fact, decided in Myers's favor, again referring only to the general surety law as set out in *First National Bank* v. *Waddell*, 74 Ark. 241, 85 S.W. 417.

In today's decision, the majority applies the Uniform Commercial Code, particularly Ark. Stat. Ann. § 85-3-606(1)(b) (Add. 1961), to a situation, like in *Myers*, where a separate personal guaranty was executed. In applying the Code provisions, the court in no way explains why the general surety law does not apply, but, instead, it simply states § 85-3-606(1)(b) of the Code applies because the facts here deal with an impairment of collateral issue—not one involving an impairment of a guaran-

tor's right of recourse, as was the case in *Myers*. The *Myers* holding cannot be so easily distinguished or explained. In my opinion, the court's original decision in *Myers* was correct, and our subsequent decision to reverse the initial holding was clearly wrong. Nonetheless, because I believe the general surety law and the evidence supports the trial judge's decision in this cause, I join the majority in its affirmance.