## THE PHIPPS-REYNOLDS COMPANY v. McILROY BANK & TRUST COMPANY.

4-5346                         124 S. W. 2d 222

Opinion delivered January 30, 1939.

*Sullins & Sullins, J. S. Jameson* and *Karl Greenhaw,* for appellants.

*Bernal Seamster,* for appellee.

SMITH, J. J. H. Phipps and W. J. Reynolds were the president and secretary-treasurer, respectively, of The Phipps-Reynolds Company, a corporation engaged in the sawmilling and timber business. They borrowed money to conduct their operations from the McIlroy Bank & Trust Company, and on March 3, 1929, were indebted to the bank in the sum of $15,000. On that date an additional credit of $2,000 was requested and granted, making the indebtedness $17,000, which was evidenced by three notes for $5,000 each and one for $2,000. These notes, as they now read, were all due ninety days after date, all bearing interest from date at the rate of 8 per cent. per annum until due, and 10 per cent. thereafter until paid, providing that the interest shall be paid quarterly and, if not paid when due, to become principal and bear interest at 8 per cent.

Phipps and Reynolds signed these notes as president and secretary, respectively, and indorsed them in their individual capacity. They had given certain collateral security for the original debt, and gave additional collateral for the increased debt, out of which transactions certain questions arose between Phipps and the estate of Reynolds, who died December 4, 1937, pending the progress of the litigation. The court reserved decision on the question of the equities between Phipps and the Reynolds estate until "after the sale of the assets of the Phipps-Reynolds Company, and said matters are passed for final adjudication and until such sale is had and confirmed."

When the four notes above-mentioned totaling $17,000 were executed to the bank a real estate mortgage was taken on the lands owned by the Phipps-Reynolds Company, and a chattel mortgage was also given on its personal property. It was recited in the real estate mortgage: "That the foregoing conveyance shall stand as security for the payment of any extension or renewal of the whole or any part of said indebtedness, whether evidenced by indorsement on the above-mentioned obligation or by the extension of indebtedness in lieu thereof; also as security for the payment of any other liability or liabilities of the grantor already or hereafter contracted

to the said grantee until the satisfaction of this deed of trust upon the margin of the record thereof, together with interest at the rate of 8 per cent. per annum unless otherwise specified.''

The chattel mortgage contains recitals of similar purport. As to the interest upon the debt, the chattel mortgage recites an existing indebtedness of $17,000, ''due ninety days after date, and bearing interest from date until due at the rate of 8 per cent. per annum, payable every ninety days, and if not so paid when due, to become as principal and bear the same rate of interest.''

It thus appears that there is a conflict as to the interest to be paid between the recitals of the notes and the recitals, above copied, from the two mortgages.

Certain sums were borrowed and evidenced by other notes, and there appears to be no controversy as to the amount of principal due. The controversy is over the rate of interest and the manner of its computation. Certain other questions are involved, which will be discussed and decided after we have considered this question of interest.

The court below adjudged the sum due, including interest, and decreed the foreclosure of both the real estate and the chattel mortgages, reserving, as above stated, certain questions between Phipps and the Reynolds estate, and from that decree is this appeal.

The original notes have been brought before us, and their mutilation is apparent. That there were erasures is conceded. Whether they were made before or after their delivery to the bank is the question of fact involved. It is insisted by appellants that, when delivered, the notes bore interest after maturity at 8 per cent., and that they were altered to bear 10 per cent. from that date.

It is conceded, of course, that if alterations were made after their execution and delivery to the bank, this action would render the notes void both as to principal and interest. Section 10282, Pope's Digest, provides that where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided, except as against a party who has himself made, authorized or assented to the alteration, and subsequent in-

dorsers, with the proviso that when an instrument has been materially altered and is in the hands of a holder in due course, not a party to the alteration, such party may enforce payment thereof according to its original tenor. Section 10283, Pope's Digest, provides, among others, that any alteration which changes: "(2) The sum payable, either for principal or interest; . . . is a material alteration."

It becomes necessary, first, to decide the question of fact whether the alteration was made before the delivery of the notes to the bank. Circumstances supporting that contention are (1) that it is apparent that there were erasures on the notes, (2) the recital as to the rate of interest to be paid and the manner of its computation contained in the mortgages does not comport with the recital on that subject appearing in the notes. It is argued also that when an erasure appears upon the face of a negotiable instrument, there is a presumption that it was made after delivery, and that the burden of showing the contrary rests upon the party seeking enforcement of the notes. We first consider this question of law as related to the decision of the question of fact.

There is quite a conflict in the authorities on the question, and our own cases are not entirely harmonious. We shall not review and distinguish these cases.

At §§. 108 and 109 of the chapter on Alteration of Instruments, 2 Am. Jur., pp. 670 and 671, is stated what we think is the proper rule to follow. It was there said:

"Section 108.—Presumption of Alteration After Execution.—The view is maintained by some authorities that an apparent alteration will be presumed to have been made after the execution of the instrument which appears to have been altered. It has been said that this doctrine arose from a misconception of certain early English cases which were based upon the stamp acts and were applicable only to negotiable instruments, though this has been denied, and the doctrine asserted to be founded in reason. Whatever may have been its origin, this harsh rule would seem to be unsound on principle, and is but little followed. The law never presumes fraud, and it is, moreover, not only harsh, but opposed to gen-

eral experience and modern commercial usage, to assume that all instruments are issued without erasures or blemish of any kind. Some authorities modify this rule to the extent of holding that a presumption that any alteration was made after execution arises only in cases where the circumstances are suspicious; but this attempt at an intermediate or compromise rule has been objected to as furnishing no definite rule by which to determine when the burden is upon the holder to explain the alteration, and when it is not, and as being simply an inference of fact drawn from the evidence in the case.

"Section 109.—Rule that No Presumption Arises.— Still another doctrine supported by numerous decisions, and based, it is believed, on the better reasoning, is that no presumption arises from an alteration apparent on the face of an instrument, but that the entire question of the time when such alteration was made is for the jury to consider in the light of all the evidence intrinsic and extrinsic. Theoretically, where this latter doctrine prevails, it will not be affected by the fact that the alteration is suspicious, but, in actual practice, it seems from many of the cases supporting the doctrine that the nature of the alteration as suspicious or otherwise is of no little importance."

A note to the text just quoted cites the following annotated cases: *Healey-Owens-Hartzell Co.* v. *Montevedeo Co.,* 165 Minn. 330, 206 N. W. 646, 44 A. L. R. 1238; *Tharp* v. *Jamison,* 154 Ia. 77, 134 N. W. 583, 39 L. R. A., N. S. 100; *Burgess* v. *Blake,* 128 Ala. 105, 28 So. 963, 86 Am. St. Rep. 78; *Wicker* v. *Jones,* 159 N. C. 102, 74 S. E. 801, 40 L. R. A., N. S. 69, Ann. Cas. 1914B, 1083.

An innumerable number of cases are cited in the notes to these annotated cases, and our examination of a number of those most frequently cited in others leads us to the conclusion that "no presumption arises from an alteration apparent on the face of an instrument, but that the entire question of the time when such alteration was made is for the jury to consider in the light of all the evidence intrinsic and extrinsic." The thought expressed in many of these cases, as in our own case of *Gist, Admr.,* v. *Gans,* 30 Ark. 285, is that "Persons holding

and expecting benefit from instruments have two motives not to alter them: First—If the alteration be material it avoids the instrument; and, Second—It is a criminal act.'' ''Yet,'' as Judge ENGLISH said in the case just cited, ''such alterations have frequently been made by persons who hoped to avoid detection and escape punishment.'' But the practice of making erasures, interlineations and corrections in writings of all kinds is of such common occurrence that we do not think a presumption of fraud should be indulged and declared to exist because of their presence in a writing. The question is rather one to be determined by court or jury as the case may be in the light of all the evidence intrinsic and extrinsic, unaffected by any presumption.

The officer of the bank who received the notes upon their execution and the other two officers who had occasion to handle the notes while in possession of the bank all testified that the notes had not been changed since their delivery to the bank. The only witness contradicting this testimony is Mr. Phipps, and he admitted that Reynolds handled the financial end of the corporation's business and had executed the notes for the company. Phipps was certain that the notes were to bear interest at 8 per cent. after maturity, and his reason for this belief was that ''Mr. Reynolds paid the interest, and if it was 10 per cent., I judge he would have said something about it.''

We conclude that the finding of the chancellor on this question of fact, to the effect that the bank had not altered the notes, is not contrary to the preponderance of the evidence.

It is insisted that the notes are usurious because of the provision for compounding interest.

Our cases are to the contrary. It was held in the case of *First National Bank* v. *Waddell*, 74 Ark. 241, 85 S. W. 417, 4 Ann. Cas. 818, to quote a headnote in that case, that ''A contract between a bank and a customer, contemplating monthly debits and credits in large sums, which provided that the bank should charge the highest lawful rate of interest, and that the rate should be com-

puted monthly on the average daily debit balances, and charged in the account, was not usurious.''

A headnote to the case of *Carney* v. *Matthewson*, 86 Ark. 25, 109 S. W. 1024, reads as follows: ''Taking a note which bears ten per cent. interest per annum and provides that if interest be not paid annually it shall become principal and bear the same rate of interest is not such a compounding of interest as would render the note usurious.''

The holding in that case was approved in the case of *Morgan* v. *Rogers,* 166 Ark. 327, 266 S. W. 273, in which case a note bearing the maximum rate of interest, to be paid semi-annually, with the proviso that if the interest was not paid annually it should become part of the principal and bear the same rate of interest, was held not usurious. It was there said: ''This court has expressly held that taking a note bearing ten per cent. interest per annum and providing that, if interest be not paid annually, it shall become principal and bear the same rate of interest, is not such a compounding of interest as would render the note usurious. *Carney* v. *Matthewson,* 86 Ark. 25, 109 S. W. 1024. It might be that the installments of interest might be made so frequent or unusual as to indicate a disposition to evade the spirit of the law and to compound the interest so rapidly as thereby to secure a greater rate of interest than that allowed under the Constitution, but there is nothing in this transaction to evince such an intention.''

See, also, *Chaffe & Sons* v. *Landers,* 46 Ark. 364; *Grider* v. *Driver,* 46 Ark. 50. Many cases on the subject are cited in the case of *Jones* v. *Nossaman,* 114 Kan. 886, 221 Pac. 271, 37 A. L. R. 325.

It may be, as was said by Judge HART in the case of *Morgan* v. *Rogers, supra,* that the installments of interest might be made so frequent and unusual as to indicate an intention to evade the usury law. But a bank loan with a rest period of ninety days does not appear to be unusual. Indeed, it is a matter of common knowledge that bank loans are rarely made for a longer period of time.

In the case of *Lesser-Goldman Cotton Co.* v. *Merchants' & Planters' Bank,* 182 Ark. 150, 30 S. W. 2d 215,

it was said: "Appellant also contends that it was unlawful to charge it with 8 per cent. interest compounded monthly, and in this contention we agree with appellant." It does not appear that there was any provision for the obligor in that case to be relieved of liability to pay compound interest by paying at the due date, nor does it appear that there was any agreement to pay compound interest. As a matter of fact, the opinion recites that the first advance in that case was made September 9, 1925, and the last December 3, 1925. Other advances in large amounts were made between those dates. The interest was computed to October 6, 1927. As a matter of fact, interest compounded monthly, at 8 per cent., between the first and the last of these dates, would not exceed 10 per cent. for that period of time. It would, therefore, have been more accurate in that case to have stated that charging compound interest was unauthorized, not because it was usurious, for it was not, but because there was no contract that the interest should be so computed. The question of usury was not involved in that case. Had we found there was a contract for usurious interest, no recovery of either principal or interest would have been allowed, yet we gave judgment for both principal and interest. We did not there permit interest to be compounded at 8 per cent. monthly, because there was no authority for doing so. Whether a loan intended to extend over a long period of time where interest compounded at 8 per cent. monthly would make the entire interest in excess of 10 per cent. for the time covered, is a question not presented in that case, nor in this.

We conclude that the court did not err in holding that the notes were not usurious.

It is insisted that the bank has estopped itself to charge interest at a higher rate than 8 per cent. after maturity even though the notes authorized a higher rate, and we think appellants are right in this contention. It may be said that it was the notes which evidenced the debt, and that the mortgages were mere security for its payment. But the mortgages did recite the rate of interest which would be charged, and Phipps testified that there was never any intimation that more than 8 per

cent. would be charged until after the foreclosure suit had been filed, and if it be said that this contention varies the terms of the note, it may be answered that the question we are now considering is whether it may be shown that the bank did not intend to enforce the provisions of the notes for the payment of 10 per cent., but intended to follow the provisions of the mortgages for the payment of only 8 per cent., and had, by its conduct, led the Phipps-Reynolds Company to believe that only 8 per cent. would be charged. We think the testimony establishes the fact that the Phipps-Reynolds Company was led to believe that only 8 per cent. had been or would be charged.

Five identical indorsements appear on each of the notes, which, together, evidenced the $17,000 loan. The first of these, dated 6-24-29, is that the interest was paid to 6-23-29; the second indorsement, dated 1-23-30, is that the interest was paid to 12-23-29; the third, dated 3-19-31, is that the interest was paid to 3-23-31; the fourth, dated 1-13-32, is that the interest was paid to 1-1-32; and the fifth, dated 12-1-32, is that the interest was paid to 12-1-32. A credit of $200 appears on each note under date of 12-13-35. It is from December 1, 1932, that the bank has charged and was given judgment for interest at 10 per cent.

We are reinforced in our conclusion that the Phipps-Reynolds Company was led to believe that 10 per cent. would not be charged after December 1, 1932, up to which date only 8 per cent. had been charged, by the fact that on December 1, 1932, an additional note was executed to the order of the bank by the Phipps-Reynolds Company for $4,975, which did not recite that "If interest is not paid when due, said interest to become as principal quarterly," but did provide "Interest payable 8 per cent. annually," with the proviso that if that interest was not paid when due, it should "become as principal and bear 8 per cent. interest."

It appears that the bank took an assignment or trust agreement to the Phipps-Reynolds plant in 1931, and had control thereof until a receiver was appointed in the foreclosure proceedings, during all of which time no interest was paid or intimation given that the interest would be

increased from 8 per cent. to 10 per cent. We think, if the bank had that intention when the property was taken over, the Phipps-Reynolds Company should have been advised of that fact. The receipt of this information might have caused the officers of the Phipps-Reynolds Company to bestir themselves to refinance the loan or to sell the property and pay the debt. It appears that the value of the property mortgaged, together with the various collaterals, exceeds the debt due the bank. There was testimony to the effect that the First National Bank of Fayetteville, in a suit against Reynolds and wife, which was consolidated with this case caused a writ of garnishment to be served upon appellee bank (the final disposition of which was reserved by the court below in the decree from which is this appeal), and the officers of the First National Bank were told by the cashier of appellee bank that they had caught enough assets to pay both banks. But whether this estimate of value proves to be correct or not, we think the Phipps-Reynolds Company should have been advised of the intention to increase the interest rate, and that appellee is now estopped from claiming the right to charge a higher rate of interest than 8 per cent. The decree must be modified in this respect.

There is a cross-appeal involving two items. The first relates to the compensation of $200 allowed the bank for services under its appointment as trustee in the management and protection of appellant's property. But we are unable to say that the court erred in that respect.

The second item relates to the date upon and from which a credit of $22,156.37 should be allowed. The facts in relation to this credit are as follows: Reynolds inherited certain property consisting in part of 437 shares of stock in a foreign corporation. This stock was among the collateral pledged to secure the indebtedness of Phipps-Reynolds Company to the bank, and, on October 8, 1936, the stock was sold, with the consent of Reynolds, for the sum stated above. A separate account of this transaction was entered upon the books of the bank. The court allowed credit for the proceeds of this stock from the date of the sale thereof. This action is questioned, for the reason stated by the president of appellee bank as

follows: "I did not think we had the right to take it on the Phipps-Reynolds' debt without foreclosing the mortgages and fixing his (Reynolds') personal liability."

The testimony is to the effect that Reynolds was the principal owner of the business, and furnished most of the capital and the basis of credit upon which the Phipps-Reynolds Company operated. The bank received this money and kept it in lieu of the collateral the sale of which had produced it. During all this time the bank was charging 10 per cent. interest, compounded quarterly, on a larger sum. There is no reason to believe that the bank would ever have returned this money to Reynolds until its debt was paid. The money was, therefore, in effect and in fact, a payment on the debt as of October 8, 1936, as found by the court. Had Phipps-Reynolds Company paid the debt, or had it been paid by foreclosure or otherwise, it would have been a mere matter of bookkeeping to repay Reynolds. One dollar would have replaced another. This money was in the possession of the bank, and would never have been returned by the bank to Reynolds until payment of its debt had been made, and we conclude, therefore, that the chancellor was correct in allowing credit for this money upon the date on which it was received.

Upon the whole the decree of the court appears to be correct, except, for the reasons herein stated, the interest should have been calculated at 8 per cent., and not at 10 per cent., and the cause will be remanded with directions to restate the account accordingly. The interest will be computed on all the notes at eight per cent. and will be compounded quarterly at that rate on the four notes totaling $17,000 from December 1, 1932. The costs of this appeal will be assessed against appellee.