Cite as 2022 Ark. App. 220

# ARKANSAS COURT OF APPEALS
## DIVISION I
### No. CV-19-499

| | |
|---|---|
| JOHN RAY DYE AND BOBBY JO DYE<br>APPELLANTS/CROSS-APPELLEES<br><br>V.<br><br>PRECISION FOUNDATION<br>SPECIALTIES & FLOW RITE<br>DRAINAGE SOLUTIONS, INC.<br>APPELLEE/CROSS-APPELLANT | Opinion Delivered May 11, 2022<br><br>APPEAL FROM THE BENTON<br>COUNTY CIRCUIT COURT<br>[NO. 04CV-17-1591]<br><br>HONORABLE JOHN R. SCOTT,<br>JUDGE<br><br>AFFIRMED ON DIRECT APPEAL;<br>REVERSED AND REMANDED ON<br>CROSS-APPEAL |

**KENNETH S. HIXSON, Judge**

This appeal arises from an order and judgment awarding the appellee/cross-appellant,

Precision Foundation Specialties & Flow Rite Drainage Solution, Inc. ("PFS"), damages for

breach of contract against the appellants/cross-appellees, John Ray Dye and Bobby Jo Dye

(collectively the "Dyes") for a cause of action arising from a residential-construction repair.

The Dyes argue that (1) PFS failed to strictly comply with the statutory notice requirement

in Ark. Code Ann. § 18-44-115 (Supp. 2021), which precluded a judgment in its favor; (2)

the contract is usurious, which voids the contract; and (3) the jury's viewing of the residence

in question deprived them of a fair trial because the deficiencies in PFS's work product were

concealed. PFS cross-appeals, arguing that it should have been awarded attorney's fees as a

matter of law and contract. We affirm on appeal, but we reverse and remand on cross-appeal.

I. *Background Facts*

The Dyes own a residence in Pea Ridge, Arkansas. The two-story residence was constructed approximately thirty years ago. The floors in some areas of the residence were uneven or sagging. The Dyes contacted PFS to inspect the floors and the crawl space to determine the cause of the problem.

PFS, a contractor, inspected the residence, including the floors and the crawl space. PFS found that the residence was built using a pier and beam construction method. Upon inspection, PFS found that some of the trusses supporting the residence were sagging or twisting between piers or pedestals and that some of the shims on top of the pedestals had compressed, causing the floors to be uneven.

The Dyes entered into a contract with PFS for construction services on the Dyes' single-family residence (the "Contract") on November 21, 2016. Pertinent to this appeal, the scope of services and schedule of pricing included:

> Removal of existing compressed shims on all existing pedestals in between existing pedestals in crawl space to include 4" 5000 psi base pads, CMU block and TIVAR shims, installation of new 14 feet of auxiliary beam under kitchen area to include pedestals. Total sum of the project of $7,500.00 with a security deposit in the amount of $3,750.00 to be paid at the contract signing. Balance to be paid in full upon completion in the amount of $3,750.00.

And the Contract provided the following regarding costs of collection:

> Section 3.6: Client [the Dyes] will reimburse PFS, Inc. for all time spent and expenses (including fees of any attorney, collection agency, and/or court costs) incurred in connection with collecting any delinquent account.

The Dyes paid $3,750 to PFS when they entered into the Contract. The work commenced a few weeks later, and PFS submitted an invoice on December 20, 2016, stating that the work was complete and that payment was due upon receipt in accordance with the payment provision in the Contract. Mr. Dye responded to the request for payment via email and requested further documentation, including photographs of the repair work. On December 21, 2016, PFS sent Mr. Dye photographs of the repairs as requested. Subsequently, the parties engaged in further email communications regarding final payment; however, despite Mr. Dye's acknowledgment that he owed PFS money, the Dyes never paid the balance of the invoice.

On January 10, 2017, PFS sent the Dyes a notice of intent to file a mechanics' and materialmen's lien. On January 20, 2017, PFS filed the lien against the Dyes' residence alleging an outstanding balance, including late fees pursuant to the Contract, in the amount of $6,114.27. PFS filed its complaint against the Dyes on August 25, 2017, for breach of contract and to enforce the lien on the property. The Dyes filed an answer wherein they denied that they were in breach of contract. The Dyes also filed a counterclaim alleging PFS was in breach of contract for PFS's failure to provide construction services that met the implied warranty of workmanlike construction as well as a violation of the Arkansas Deceptive Trade Practices Act (ADTPA) claiming that PFS's contract was usurious. Additionally, the Dyes protested the lien filed on their residence and sought a declaration

from the circuit court that PFS had failed to comply with the statutory notice provisions of Ark. Code Ann. § 18-44-115.[1]

On February 23, 2018, the Dyes filed a motion for partial summary judgment alleging that as a matter of law, PFS's contract was unenforceable for its failure to comply with the notice requirements of Ark. Code Ann. § 18-44-115, and because the late fees included in the Contract are usurious. PFS responded, arguing that it qualified for the "direct sale" exemption to the notice requirements of the statute and that the Contract was not usurious in that the late fees were a permissible penalty for the Dyes' failure to pay. The Dyes filed a reply contending that (1) PFS did not qualify for the "direct sale" exemption because the exemption had been subsequently clarified by our legislature to preclude contractors like PFS and that the clarification should be applied retroactively to this contract, and (2) the charges were a mere cloak for usury because they were recurring in nature rather than a one-time penalty.

The circuit court held a hearing on the Dyes' motion for partial summary judgment, and on May 23, 2018, entered an order denying the motion. Specifically, the court held that PFS was entitled to the "direct sale" exemption; therefore, the statutory notice was not required. The court further found, contrary to the contention of retroactivity by the Dyes, that the effective date of Act 808 of 2017, which amended Ark. Code Ann. § 18-44-115 to

---

[1]The lien was subsequently discharged by the agreement of the parties for noncompliance with Ark. Code Ann. § 18-44-118 (Repl. 2018) for reasons that are not pertinent to the issues in this appeal.

explicitly require residential contractors to provide the important notice, was August 1, 2017, and should not be applied retroactively. Regarding late fees, the circuit court cited supreme court precedent in *Hayes v. First National Bank of Memphis*, 256 Ark. 328, 507 S.W.2d 701 (1974), which held that penalties to induce prompt payment are free from usury; therefore, the Contract was not void. The court, however, did find that the late fees imposed by the Contract were unconscionable and dismissed the portion of PFS's complaint attempting to collect the late fees.

The case proceeded to a two-day jury trial on October 29–30, 2018. In a pretrial motion, the Dyes requested that the jury be transported to their residence for a visual inspection, which the circuit court granted. Therefore, after the close of testimony from two experts as well as Mr. Dye and a representative of PFS, the circuit judge led the jury, silently and in a single-file line, through the residence at the Dyes' request. Ultimately, the jury returned a verdict in favor of PFS and awarded damages in the amount of $3,750. Thereafter, the Dyes filed a motion for judgment notwithstanding the verdict and motion for a new trial as well as a notice of appeal. The circuit court entered a judgment pursuant to the verdict in favor of PFS on November 20, 2018. The circuit court did not enter an order on the Dyes' posttrial motions; therefore, they were deemed denied. Accordingly, the Dyes amended their notice of appeal to include the deemed denial of both posttrial motions.

On November 30, 2018, PFS filed a motion for attorney's fees, interest, and costs in the amount of $24,646.50. The motion contained an affidavit of expert witness, Justin Hall, wherein he described the fee agreement and invoice for his expert testimony for PFS; and an

affidavit of Barrett Moore in support of the attorney's fees requested by PFS's counsel. The Dyes responded and alleged deficiencies in PFS's motion and also filed a counterclaim for their own attorney's fees expended to discharge the lien on their property. Subsequently, PFS filed an amended motion for attorney's fees, interest, and costs in the amount of $26,851.50.[2] After a hearing on the motions, the circuit court entered an order denying each party's motion for attorney's fees. However, the circuit court granted PFS costs in the amount of $50 for the service fee and $165 for the filing fee; awarded PFS prejudgment interest in the amount of $431.50 and 6 percent postjudgment interest; and denied PFS's request for expenses related to its expert witness. PFS filed a motion for reconsideration on February 18, 2019, arguing that the circuit court should have enforced the Contract as written and held the Dyes liable for all the expenses PFS incurred in collecting the delinquent amount, including attorney's fees and expenses related to their expert witness. The circuit court denied the motion for reconsideration on March 8, 2019, and PFS filed a timely notice of cross-appeal on March 11, 2019.

On appeal, the Dyes argue the following: (1) PFS's failure to strictly comply with statutory notice requirements precludes a judgment in its favor; therefore, the circuit court should have entered judgment notwithstanding the verdict; (2) PFS's contract is usurious

---

[2]We note that the parties disputed whether PFS could properly file an amended motion and whether the circuit court considered it. However, from our review of the record, there is nothing to reflect that the circuit court disregarded the amended motion in entering its final order regarding attorney's fees and costs. As such, we need not address this issue any further.

because it provides for recurring late fees in the amount of 22.5 percent per week, rendering the agreement void; and (3) the jury viewing deprived them of a fair trial because the deficiencies in PFS's work product were concealed, rather than highlighted; thus, the circuit court should have ordered a new trial.

On cross-appeal, PFS contends the circuit court erred by not enforcing the terms of the Contract by ordering the Dyes to reimburse PFS for all expenses it incurred to collect the delinquent payments, including attorney's fees and expenses related to their expert witness. In the alternative, PFS contends the circuit court should have granted some reasonable amount of attorney's fees pursuant to Ark. Code Ann. § 16-22-308 (Repl. 1999).

II. *Standard of Review*

The circuit court's rulings on retroactive application of Act 808 of 2017 and the issue of usury in the Contract are both questions of law. This court reviews questions of law de novo. *Scottsdale Ins. Co. v. Thrower*, 2021 Ark. App. 300, 626 S.W.3d 163. We also review issues of statutory interpretation de novo. *City of Ft. Smith v. Carter*, 372 Ark. 93, 270 S.W.3d 822 (2008). Our supreme court has directed that the basic rule of statutory construction is to give effect to the intent of the General Assembly. *Ryan & Co. AR, Inc. v. Weiss*, 371 Ark. 43, 263 S.W.3d 489 (2007). In determining the meaning of a statute, our first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* This court construes the statute so that no word is left void, superfluous, or insignificant, and meaning and effect are given to every word in the statute

7

if possible. *Id.* When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to resort to rules of statutory construction.

III. *Appeal*

A. Retroactive Application of Ark. Code Ann. § 18-44-115

On appeal, the Dyes argue that PFS was precluded from receiving a judgment in its favor because PFS undisputedly did not comply with the notice provisions of Ark. Code Ann. § 18-44-115 (sometimes referred to as "section 115").

To set the table for this discussion, Arkansas law regarding lien notices by contractors has been in a state of flux since at least 2017. We start with Ark. Code Ann. § 18-44-115, which was in effect on the date the contract at bar was entered into by the parties. We will refer to that version as the "pre-2017 version." In 2017, the legislature addressed some shortcomings in section 115 by passing Act 808 of 2017, effective August 1, 2017. We will refer to that version as the "2017 version" or "Act 808 of 2017." However, the legislature was not finished tinkering with the notice requirements in section 115, and so in 2021, the legislature passed Act 984 of 2021, effective July 28, 2021. We will refer to this version as the "2021 version" or "Act 984 of 2021." Each of these versions changed the responsibilities of contractors regarding lien notices and the consequences of failing to serve the notices properly. One of the challenges in this appeal is to apply the correct version of the lien-notice statute to the facts in this case.

The contract at issue herein was entered on November 21, 2016, and PFS provided its services in December 2016. It is unquestioned that the pre-2017 version of section 115

was in effect when the parties entered into the contract and when PFS provided its services. The revision contained in Act 808 of 2017 did not become effective until August 1, 2017, while this lawsuit was pending below. Act 808 of 2017contains provisions that arguably benefit the Dyes. To cut to the chase, the Dyes are asking this court to apply Act 808 of 2017 retroactively to dismiss PFS's claims for damages for nonpayment. We decline to do so.

To begin our analysis, we must generally compare the pre-2017 version of section 115 to the Act 808 of 2017 version of section 115 to understand why the Dyes are so adamant that Act 808 of 2017 should be applied retroactively. Essentially, the pre-2017 version of section 115 included an exemption from the notice requirements for a residential contractor that provides a "direct sale" of materials or services to the owner. However, the Act 808 of 2017 version inter alia removed the "direct sale" characterization from the definition for home-improvement contractors as defined by Ark. Code Ann. § 17-25-502(2) (Supp. 2021) and from the definition of residential building contractors as defined by § 17-25-502(3) as they are applied in in section 115.[3] Instead, under the Act 808 of 2017 version, those defined contractors were required to furnish notice as required under the statute. If those contractors did not furnish notice as required under the statute, the contractor was barred from bringing an action to enforce any provision of a residential contract. Because the parties herein agreed that the notice given by PFS to the Dyes was nonconforming, the Dyes

---

[3]The parties do not dispute that PFS is a residential building contractor under the statute.

9

argue that the fatal penalties contained in Act 808 of 2017, which bar any recovery under the Contract, should be applied retroactively.

More specifically, the Dyes argued before the circuit court, as they do on appeal, that PFS was required, pursuant to Ark. Code Ann. § 18-44-115 (the Act 808 of 2017 version), to provide the "important notice to owner" before beginning construction. To support this claim, the Dyes submit that the amendment to the statute requiring residential contractors to give the notice should have been applied retroactively by the circuit court. Therefore, they contend PFS is unable to collect any amount under the Contract, pursuant to Ark. Code Ann. § 18-44-115(a)(4) which, as amended, barred residential contractors from any recovery should they fail to give the notice before work commences.[4] The circuit court disagreed with the Dyes and refused to grant retroactive application of Act 808 of 2017. Specifically, the court held that when the work was completed, PFS was not required to give the preconstruction notice set forth in Ark. Code Ann. § 18-44-115, and furthermore, that the supreme court's ruling in *Ellison v. Tubbs*, 295 Ark. 312, 749 S.W.2d 650 (1988), was controlling regarding retroactive application of a statute.

The notice requirements contained in Ark. Code Ann. § 18-44-115 require strict compliance; substantial compliance is not sufficient. *Books-A-Million, Inc. v. Ark. Painting &*

---

[4]Since the filing of this appeal, Ark. Code Ann. § 18-44-115 has been amended again by Act 984 of 2021 to only preclude a residential contractor's lien rights if the appropriate notice requirements are not followed. However, when the act in question was enacted in 2017, failure to strictly follow the notice requirements of Ark. Code Ann. § 18-44-115 precluded residential contractors from enforcing any provision of a residential construction contract.

*Specialties Co.*, 340 Ark. 467, 472, 10 S.W.3d 857, 861 (2000).  However, it is undisputed that when the parties herein entered into the Contract and PFS performed its services in late 2016, PFS was under no obligation to provide the statutory notice in the absence of retroactive application of Act 808 of 2017.  The pre-2017 version of Ark. Code Ann. § 18-44-115(a)(8)(A) provided an exemption for situations that constituted a "direct sale."   In *Hammerhead Contracting & Development, LLC v. Ladd*, our supreme court expressly stated that when a homeowner has ordered materials or services directly from the lien claimant, the transaction constitutes a direct sale, and the lien claimant has no obligation to give the homeowner the statutory notice.  2016 Ark. 162, 489 S.W.3d 654.  The court reiterated in *Hammerhead* that the homeowner is in direct privity of contract with the direct-sale contactor; therefore, the exception applies.  *Id.*

Here, the construction began on December 17, 2016, and ended on December 20, 2016.  To add to the confusion, in late 2016, PFS apparently was under the mistaken belief that it was required to send the preconstruction notice to its customers pursuant to section 115.[5]  It is undisputed that PFS sent the notice via email prior to commencement of work on December 17 and then again sent the statutory notice by certified mail on January 10, 2017.  As a result, the Dyes contend on appeal that PFS "knew" or at least thought it was required to comply with the notice requirements of the statute and that this "subjective awareness" imputed onto PFS an obligation to provide the notice in accordance with the

___

[5]It is unclear in the record whether PFS was unfamiliar with the direct-sale exemption.

11

statute that was amended by the legislature some eight months later in August 2017. This argument, however, has no merit. PFS's subjective, but incorrect, awareness of the requirements of the statute does not negate controlling Arkansas law merely because PFS, as the Dyes suggest, made a conscious decision not to rely on it. *Hammerhead* was controlling precedent when the work commenced and throughout its completion; Act 808 of 2017 had not yet even been submitted to the legislature.

The Arkansas Supreme Court has consistently set forth the law regarding retroactive application of statutes. *See, e.g.*, *McMickle v. Griffin*, 369 Ark. 318, 254 S.W.3d 729 (2007). It is as follows:

> Retroactivity is a matter of legislative intent. Unless it expressly states otherwise, we presume the legislature intends for its laws to apply only prospectively.
>
> However, this rule does not ordinarily apply to procedural or remedial legislation. The strict rule of construction does not apply to remedial statutes which do not disturb vested rights, or create new obligations, but only support a new or more appropriate remedy to enforce an existing right or obligation. Procedural legislation is more often given retroactive application. The cardinal principle for construing remedial legislation is for the courts to give appropriate regard to the spirit which promoted its enactment, the mischief sought to be abolished, and the remedy proposed.

369 Ark. at 338–39, 254 S.W.3d at 746 (citing *Bean v. Off. of Child Support Enf't*, 340 Ark. 286, 296-97, 9 S.W.3d 520, 526 (2000)). The general rules also apply to amendatory acts. *See Gannett River States Publ'g Co. v. Ark. Ind. Dev. Comm'n*, 303 Ark. 684, 799 S.W.2d 543 (1990). Any doubt on the matter is resolved against retrospective application. *City of Dover v. Barton*, 337 Ark. 186, 987 S.W.2d 705 (1999). Act 808 of 2017 is titled "An Act to Amend the Law Concerning the Notice of Lien upon Residential Real Estate; To Clarify the

Meaning of a Direct Sale; and for Other Purposes." While the legislature expressly enacted Act 808 to clarify the meaning of a "direct sale," inter alia, the General Assembly did not express an intent for the amendment to be applied retroactively.

On appeal, the Dyes also maintain that Act 808 of 2017 is procedural or remedial in nature. As quoted above, our supreme court has acknowledged that in the case of procedural or remedial measures, a court may apply a statute retroactively. *McMickle*, 368 Ark. 318, 254 S.W.3d 729. However, an amendment to a statute that disturbs vested rights or creates new obligations will not be applied retroactively. *Id.* In support of their argument, the Dyes rely heavily on *Archer v. Sisters of Mercy Health System, St. Louis, Inc.*, 375 Ark. 523, 294 S.W.3d 414 (2009). In *Archer*, the court found that a direct-action statute could be applied retroactively because it did not create a new legal right but, instead, clarified that injured parties also had "a new or substitute remedy." *Id.* at 530, 294 S.W.3d at 418. Furthermore, the court held that the Act in question was clearly enacted to reverse prior caselaw, thereby supporting retroactive application. *Id.* at 532, 294 S.W.3d at 420. *Archer* provides no guidance for this court, however, because the defendant had no vested or contractual rights at stake. The act merely provided a new or substitute remedy for an injured party; it did not terminate a parties' contractual right to be paid for its work.

Once amended, Ark. Code Ann. § 18-44-115 (the Act 808 of 2017 version) did not merely set forth the requirements a residential contractor had to comply with in order to file a lien; rather, failure to give the statutory notice by residential contractors barred a contractor from bringing any action at law or in equity to enforce any provision of a residential contract.

13

Accordingly, giving retroactive application to Act 808 of 2017 would destroy any cause of action to seek payment for its work by a contractor who fell within the direct-sale exception prior to the amendment but who complied with the requirements of the statute that existed at that time. Retroactive application in this instance would be entirely contrary to well-established law against disturbing vested rights.

Here, the circuit court cited *Ellison*, 295 Ark. 312, 749 S.W.2d 650, to support its finding that Act 808 of 2017 should not be applied retroactively. In *Ellison*, the court cited long-standing law regarding the prohibition against passing laws that impair contractual obligations. The court noted as follows:

> The laws which are in force at the time when, and the place where, a contract is made and to be performed, enter into and form part of it. This is only another mode of saying that parties are conclusively presumed to contract with reference to the existing law. The Constitution forbids all laws, alike, which affect the validity, construction, discharge and enforcement of contracts. The State may change legal remedies, forms of action, of pleading and of process, the times of holding courts, etc., and may shift jurisdiction from one court to another. And such changes may have the incidental effect of delaying the collection of debts. But the Legislature cannot, under the guise of legislating upon the remedy, in effect, impair the obligation of contracts. The idea of right and remedy are so intimately associated as often to be inseparable. Now any legislation which deprives a party of a remedy substantially as efficient as that which existed at the making of the contract, does impair its obligatory force.

*Id.* at 316, 749 S.W.2d at 652 (quoting *Robards v. Brown*, 40 Ark. 423, 427 (1883)). In *Ellison*, a contractor failed to provide the statutory notice,[6] although prior to the commencement of

---

[6]There was yet another version of the contractor-lien notice statute in effect at the time of *Ellison*.

14

the work, the legislature passed an act requiring the notice in order to perfect a lien. Specifically, the Act in *Ellison* had already been passed when the contract was entered into, and there were services and materials supplied prior to the enactment of the notice requirement and after its effective date. The court held that the parties were "conclusively presumed" to have contracted with reference to the existing law and affirmed the circuit court's ruling that the appellant was entitled to a lien only for materials and labor that were furnished before the effective date of the 1979 notice act. *Id.*, 729 S.W.2d at 653.

Here, the legislative history of Act 808 of 2017 provides that it was approved by the legislature in April of 2017 and formally enacted in August of 2017. Therefore, the amended statutory notice was not required to be given by PFS when it entered into the contract with the Dyes, during the project, or even relatively close to the time the work was completed in December of 2016. PFS was presumed to have contracted with reference to the existing law, and it did so.[7] Furthermore, retroactive application in this instance would be entirely contrary to Arkansas law against impairing vested rights. This court will not apply an amendment retroactively that would eliminate the obligation of one party to perform under the terms of a contract the party admittedly entered into while also depriving another of its contractual right to be paid.

---

[7]This is true despite the fact that PFS incorrectly believed it was required to provide a preconstruction statutory notice.

15

Before concluding this discussion, we address the Dyes' misplaced reliance on *Sluyter v. Wood Guys, LLC*, 2021 Ark. App. 442, 638 S.W.3d 849. Recall, as we mentioned above, that due to the flux of section 115 since 2017, one of the challenges in reviewing section-115 cases is to be careful and apply the correct version of section 115 to the contract in question. In *Sluyter*, the contract was entered into and performed in early 2019. This was during the period of time that Act 808 of 2017 was effective but before Act 984 of 2021 became law.[8] The 2017 version of section 115 generally provided that in the event a residential contractor failed to give the required preconstruction notice, a residential contractor was barred from any recovery. Even though the residential contractor failed to give the required preconstruction lien notice as required under the 2017 version of section 115, the circuit court still awarded a judgment in the amount of $5,289.95. On appeal, we reversed the judgment of the circuit court because the 2017 version of section 115, which was unquestionably in force at the time of the contract, provided that in the event a residential contractor failed to give the required notice, the residential contractor was barred from bringing an action at law or in equity to enforce the contract.[9] Here, because it is undisputed

---

[8]In 2021, the legislature again attempted to "fix" section 115 by passing Act 984 of 2021. The 2021 fix generally provides that when a contractor fails to give the required preconstruction notice, the contractor may not impose a lien on the property; however, the contractor is allowed to file a lawsuit for damages for the unpaid balance of the contract.

[9]Although the *Sluyter* case went into a more detailed discussion of whether the residential contractor involved met the statutory definitions of a residential contractor and, more specifically, a home-improvement contractor and the implications of its characterization as it pertains to the 2017 version of section 115, such detailed discussion is unnecessary to this opinion.

that the 2017 version of section 115 was not in effect when the Dyes entered into their contract or before services were performed, *Sluyter* is inapplicable to the case at bar and provides no relief for the Dyes.

For these reasons, we affirm the circuit court's finding that PFS was not required to give the statutory notice described in the pre-2017 version of Ark. Code Ann. § 18-44-115 that was in effect at the time of the contract; further, the amendment to the statute, set forth in Act 808 of 2017, is not applied retroactively.

## B. Usury

For their second point on appeal, the Dyes assert that the circuit court erred by not entering judgment notwithstanding the verdict because PFS's contract is void and against public policy. Specifically, they contend the Contract is usurious because it provides for recurring "late fees" in the amount of 22.5 percent per week. In response, PFS declares that the provision for late fees in the Contract is merely a penalty for not paying, intended to induce prompt payment, and could have been avoided; thus, it does not amount to usury or void the Contract.

Section 3.6 of the general conditions to the Contract states the following: "All invoices are due and payable upon presentation, and any amounts unpaid 1 day after the invoice date will include a late payment charge from the date of the invoice, at 22.5 percent per week or the maximum legal rate, whichever is higher." The circuit court denied the Dyes' motion for summary judgment on this issue by ordering that "the late fee provision in the Plaintiff's contract does not reflect an attempt to collect interest on a debt but is rather

17

a penalty for failure to make prompt payment," citing to our supreme court's holding in *Hayes*, 256 Ark. 328, 507 S.W.2d 701, as persuasive. While the circuit court declared the late fees not usurious; it did, however, find such fees unconscionable and held that if it prevailed, PFS could not collect the fees.

The maximum lawful rate of "interest" on loans or contracts shall not exceed 17 percent per annum. *See* Ark. Const. Amend. 89 § 3; Ark. Code Ann. § 4-57-104 (Supp. 2021). All contracts having a rate of interest in excess of the maximum lawful rate of 17 percent shall be void as to principal and interest. *See* Ark. Const. Amend. 89 § 6(b). Furthermore, our General Assembly passed a statutory protection against usury, which states as follows:

> No person or corporation shall, directly or indirectly, take or receive in money, goods, things in action, or any other valuable thing, any greater sum or value for the loan or forbearance of money or goods, things in action, or any other valuable thing, than is prescribed in § 4-57-104.

Ark. Code Ann. § 4-57-105 (Repl. 2011).

At the outset, the burden of showing that a contract is usurious rests upon the party who asserts it. *Geyer v. First Ark. Dev. Fin. Corp.*, 245 Ark. 694, 434 S.W.2d 301 (1968). In *Geyer*, the court said, quoting from *Sawyer v. Dickson*, 66 Ark. 77, 79, 48 S.W. 903, 903 (1898), that a court should not presume a contract to be usurious. Actually, usury will not be presumed, imputed, or inferred where an opposite result can be reached. *Peoples Loan & Inv. Co. v. Booth*, 245 Ark. 146, 431 S.W.2d 472 (1968). In determining whether a contract is usurious, it must be viewed as of the time it is entered into, and it must be presumed that

it will be performed according to its terms. *Sloan v. Sears, Roebuck & Co.*, 228 Ark. 464, 308 S.W.2d 802 (1957); *Harris v. Guar. Fin. Corp.*, 244 Ark. 218, 424 S.W.2d 355 (1968); *Gen. Cont. Corp. v. Duke*, 223 Ark. 938, 270 S.W.2d 918 (1954).

Furthermore, our supreme court has held that a "late charge" is in the nature of a penalty for delinquency and does not render the transaction usurious, even when provided for in the instrument evidencing it. *Harris*, *supra*; *Carney v. Matthewson*, 86 Ark. 25, 109 S.W. 1024 (1908); *see also Phipps-Reynolds Co. v. McIlroy Bank & Tr. Co.*, 197 Ark. 621, 124 S.W.2d 222 (1939). The rationale of these cases is that agreements for penalties to induce prompt payment are free from usury, because the buyer has it in his power to avoid the penalty by discharging the debt when it is due. *Carney*, *supra*. This is not to say, however, that such an agreement will not be declared usurious if it is shown to be a "mere contrivance" to avoid usury, and the real intention is a loan or forbearance of money and the taking of more than legal interest. *See Phipps-Reynolds Co.*, *supra*. Rather, such an intention must first be manifest from the agreement itself or from extraneous proof.

Here, the circuit court declared *Hayes* persuasive and concluded that because the Dyes could have avoided the late fees by performing their obligation and making prompt payment pursuant to their contract, the late fees are not usurious. On appeal, the Dyes fail to distinguish the ruling in *Hayes*. Instead, the Dyes reiterate that labels such as "late fees" or "service charges" cannot be used in contracts as of way of avoiding the word "interest" and our constitution's prohibition against usurious contracts. Finally, the Dyes delve into instances when our appellate courts have found "late fees" usurious. In *Smith v. Figure World*

19

*Plus, Inc.*, 288 Ark. 355, 705 S.W.2d 432 (1986), the court held that while these cases should be examined on their own particular facts, two of the principal factors in determining if the charge is truly a penalty is whether the charge is fixed in amount and whether it is assessed as a one-time charge. The court further cited *Hayes*, stating that those factors are used in the court's analysis because they are indicators of whether the charge is designed to induce prompt payment and whether the borrower has in it the power to avoid the charges. *Smith*, 288 Ark. at 356, 705 S.W.2d at 433.

In accordance with the above-described factors, the Dyes assert that the late fees in the Contract were a mere "subterfuge for interest" and designed to compensate PFS for the time value of the amount outstanding on the alleged debt. The burden of proving that the Contract was usurious is on the Dyes. This court will not declare or presume usury when an opposite result can be reached; the Contract must be viewed at the time it was entered and presumed it would be performed according to its terms. *See Sloan*, 288 Ark. at 469, 308 S.W.2d at 806. The Contract expressly called for payment in the amount of $7,500 for construction repairs with a security deposit of $3,750 to be paid at contract signing and the remaining $3,750 was to be paid in full upon completion of the project. The late-fees provision of the Contract provided: "The failure by Client to pay PFS, Inc. within one day (24 hours) of date of invoice will constitute a substantial failure of Client to perform under this Agreement."

The circuit court held that the Dyes could have avoided the late fees had they performed their obligation and made prompt payment upon completion of the work. We

agree, and our precedent simply does not support a finding of usury in circumstances where the late fee in question could have been avoided if the contractual obligations had been performed. While the Dyes maintain that the late fees were actually a "subterfuge for interest," such intent must first be manifest from the agreement itself or from extraneous proof. We find nothing in the record to give any indication that the late-fees provision of the Contract was anything other than what it purports to be—a fee designed to induce prompt payment. Furthermore, the Dyes failed to set forth any extraneous proof of usurious intent on PFS's part at the time the contract was entered into.

Finally, as discussed in *Smith*, the factors described above are not meant to be the only factors but rather "good indicators" to consider in determining if the charge in a contract is a true penalty; in fact, the court expressly held that each case must be examined by its own particular facts. 288 Ark. at 356, 705 S.W.2d at 433. However, because we find no error in the circuit court's finding that the express terms of PFS's contract merely reflect a penalty for failure to make prompt payment, it is unnecessary for us to apply the *Smith* factors.

In conclusion, the Dyes did not satisfy their burden of proving that the Contract is usurious. By law, this court will not presume usurious intent in a contract if the opposite result can be reached. The record simply does not support any conclusion other than that the late-fees provision in the Contract was included to induce prompt payment for services rendered. Accordingly, we affirm the circuit court's ruling that the Contract was not usurious.

21

## C. Jury Viewing

For their third point on appeal, the Dyes contend that the jury's viewing of their residence deprived them of a fair trial because it concealed, rather than highlighted, the deficiencies in PFS's work product. We find that the Dyes failed to preserve this argument on appeal. Our supreme court has held that "a contemporaneous objection is necessary in order to preserve an issue for appellate review." *Berry v. St. Paul Fire and Marine Ins. Co.*, 328 Ark. 553, 564, 944 S.W.2d 838, 844 (1997). Therefore, an appellant's failure to object at the first opportunity precludes this court's review of the issue on appeal. *Id.*

Here, in a pretrial motion, the Dyes moved the circuit court to allow a jury viewing of their residence. The circuit court granted the motion, and after the close of testimony, the judge led the jury, silently and in a single-file line, through the residence. Neither party made any objections to the path that was taken at the conclusion of the viewing or at any time prior to the verdict. After the verdict in favor of PFS was rendered, the Dyes moved for a new trial, citing procedural irregularities in the jury viewing. However, the Dyes were required by law to make a contemporaneous objection detailing the alleged irregularities in the jury viewing. The Dyes' failure to make such an objection precludes our review of this issue on appeal.

## IV. *Cross-Appeal*

On cross-appeal, PFS contends that the circuit court erred by not granting its request for *all* expenses (including their request for attorney's fees and expert witness fees) incurred in connection with collecting the delinquent account either as a matter of contract or

22

pursuant to Ark. Code Ann. § 16-22-308. In response, the Dyes argue against an award of fees for the following reasons: (1) PFS waived and/or abandoned its right to these fees because it did not present them to the jury as an element of its breach-of-contract damages; (2) the attorney's-fee provision lacks mutuality; therefore, it is unenforceable; (3) a motion for attorney's fees is not a pleading that can be amended pursuant to our rules of civil procedure; therefore, the circuit court did not abuse its discretion in disregarding such; and (4) allowing the amendment to the motion would have prejudiced the Dyes.

The circuit court granted PFS's request for a hearing on the issue of fees and costs, and a hearing was held on January 29, 2019, wherein the court considered all pending motions regarding attorney's fees and costs. This included the Dyes' cross-motion for attorney's fees based on time spent for successfully discharging the lien. On February 12, 2019, the circuit court entered an order denying the cross-motions for attorney's fees. However, the circuit court granted PFS costs in the amount of $50 for the service fee and $165 for the filing fee and awarded PFS prejudgment interest in the amount of $431.50 and 6 percent postjudgment interest. Important to this appeal, the circuit court did not award PFS expenses or costs related to its expert witness.

A.      Attorney's Fees

The general rule relating to attorney's fees is well established and is that attorney's fees are not allowed except when expressly provided by statute. *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990). Arkansas allows a prevailing party in a breach-of-contract

case to recover reasonable attorney's fees pursuant to Ark. Code Ann. § 16-22-308. The statute provides:

> In any civil action to recover on . . . breach of contract, *unless otherwise provided by law or the contract* which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

(Emphasis added.) The word "may" in the statute implies permissive or discretional, rather than mandatory, action or conduct and is construed in a permissive sense. *Chrisco*, 304 Ark. at 229, 800 S.W.2d at 718. A circuit court, therefore, is not required to award attorney's fees under this statute, and any amounts awarded are discretionary. *Conway Comm. Warehousing, LLC v. FedEx Freight E., Inc.*, 2011 Ark. App. 51, 381 S.W.3d 94. Accordingly, Ark. Code Ann. § 16-22-308 gives a court discretion to award reasonable attorney's fees in the absence of an agreement of the parties providing for payment of such fees. *See First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 832 S.W.2d 816 (1992). Therefore, we hold that the court did not abuse its discretion in refusing to award attorney's fees under Ark. Code Ann. § 16-22-308. However, that does not conclude our analysis regarding the attorney's fees.

In addition to the contention that the court erred in failing to award attorney's fees under Ark. Code Ann. § 16-22-308, PFS argues that the court erred in failing to award attorney's fees under the express terms of the contract between the parties. Our appellate courts have held that even if certain fees are not awarded by statute or rule, such fees may still be due under the language of a contract. *See Griffin v. First Nat'l Bank of Crossett*, 318

24

Ark. 848, 888 S.W.2d 306 (1994). The imposition of attorney's fees pursuant to the terms of a contract is independent of the statutory authorization providing for attorney's fees under the circumstances covered by Ark. Code Ann. § 16-22-308. *See id.* When the parties enter into a written contract that specifically provides for the entitlement to certain fees incurred in the enforcement of the contract, the agreement is enforceable according to its terms. *Marcum v. Wengert*, 344 Ark. 153, 40 S.W.3d 230 (2001). Furthermore, the words of a contract are to be taken and understood in their plain meaning, and our supreme court has interpreted the word "shall" to indicate mandatory compliance unless compliance would result in an absurdity. *Id.*

*Marcum* involved a breach of a lease agreement. *Id.* The lease agreement provided that "the prevailing party shall be entitled to all costs incurred in connection with such action, including a reasonable attorney's fee." *Marcum*, 344 Ark. at 165–66, 40 S.W.3d at 238. Similar to the case at bar, the prevailing party in *Marcum* claimed attorney's fees from both the mandatory express provisions in the lease agreement and pursuant to Ark. Code Ann. § 16-22-308. The circuit court declined to award attorney's fees. On appeal, the supreme court reversed and remanded the failure to award attorney's fees under Ark. Code Ann. § 16-22-308 for reasons unrelated to this appeal. However, importantly, the supreme court also reversed and remanded for the court to award attorney's fees "pursuant to [paragraph sixteen of] the lease agreement." *Id.*

Here, section 3.6 of the Contract provides: "Client [the Dyes] will reimburse PFS, Inc. for all time spent and *expenses* (*including fees of any attorney*, collection agency, and/or

court costs) incurred in connection with collecting any delinquent account." Therefore, given the plain language of the contract mandating an award of attorney's fees, the circuit court erred in failing to award PFS attorney's fees. Accordingly, we reverse and remand for the circuit court to award PFS attorney's fees pursuant to the terms of the contract.

### B. Costs and Expenses

Recall that section 3.6 of the Contract provides: "Client [the Dyes] will reimburse PFS, Inc. for *all* time spent and *expenses* (*including* fees of any attorney, collection agency, and/or court costs) incurred in connection with collecting any delinquent account." The question here is what types of expenses are recoverable under this provision in the contract? The contract provides that the Dyes will reimburse PFS for "all . . . expenses (including . . . court costs.)" The parenthetical insertion modifies the term "expenses." So, PFS is clearly entitled to "court costs." Rule 54(d) of the Arkansas Rules of Civil Procedure gives the circuit court discretion in deciding whether to award a prevailing party certain costs. The rule specifically provides the following:

(1) Costs shall be allowed to the prevailing party if the court so directs, unless a statute or rule makes an award mandatory.

(2) Costs taxable under this rule are limited to the following: filing fees and other fees charged by the clerk; fees for service of process and subpoenas; fees for the publication of warning orders and other notices; fees for interpreters appointed under Rule 43; witness fees and mileage allowances as provided in Rule 45; fees of a master appointed pursuant to Rule 53; fees of experts appointed by the court pursuant to Rule 706 of the Arkansas Rules of Evidence; fees of translators appointed by the court pursuant to Rule 1009 of the Arkansas Rules of Evidence; and expenses, excluding attorney's fees, specifically authorized by statute to be taxed as costs.

26

Therefore, the circuit court here was within its discretion in awarding PFS costs in the amount of $50 for the service fee and $165 for the filing fee.

Now, we turn our attention to the expenses relating to the expert witness. Generally, expert-witness expenses and fees are not "court costs" as contemplated by Ark. R. Civ. P. 54(d). However, as in the attorney's-fees discussion above, a party may contract for the payment of additional expenses as costs of collection. *See Phi Kappa Tau Housing Corp. v. Wengert*, 350 Ark. 335, 86 S.W.3d 856 (2002). Therefore, given the plain language of the contract mandating an award of all expenses, the circuit court erred in failing to award PFS its expert-witness fees. Accordingly, we reverse and remand for the circuit court to determine the amount of expert-witness expenses to be awarded to PFS pursuant to the terms of the contract.

V. *Conclusion*

We affirm the circuit court's order on direct appeal and reverse and remand on cross-appeal.

Affirmed on direct appeal; reversed and remanded on cross-appeal.

GLADWIN and KLAPPENBACH, JJ., agree.

*Kezhaya Law PLC*, by: *Matthew A. Kezhaya*, for appellants/cross-appellees.

*The Law Offices of Watson and Watson, PLLC*, by: *Tim Watson Jr.*, for appellee/cross-appellant.